[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
These are consolidated administrative appeals. The first appeal is brought by the Southern New England Telephone Company ("SNET") from a July 9, 1999, decision of the Department of Public Utility Control ("DPUC") requiring SNET to refund to customers "unreasonable profits" CT Page 2380 under General Statutes § 16-8b. The second appeal is brought by the Office of Consumer Counsel ("OCC") also challenging this DPUC decision.
The following facts appear in the record. SNET is a public service company under General Statutes § 16-1(4) and a telephone company under General Statutes § 16-1(23). On August 23, 1998, the Communications Workers of America, Local 1298 went on strike against SNET for a period of twenty-six days, and ended with the filing of the ratification of a new contract on September 17, 1998. Pursuant to General Statutes § 16-8b, the DPUC initiated an administrative proceeding to investigate the impact of the strike on SNET. SNET filed its 1998 Work Stoppage Report on October 16, 1998, providing data on its expenditures incurred during the work stoppage as well as information detailing how its service quality had been affected by the strike.
The DPUC held hearings in this matter and a draft decision was issued on April 16, 1999. This draft concluded that § 16-8b did apply to SNET and that SNET did have both "unreasonable profits" and impairment of service as a result of the strike. To understand the calculations set forth in the draft and subsequent decisions, the court refers to OCC-1.[1] SNET had reduced expenses of $13.2 million drawn basically from bargaining unit "base wages" and overtime that did not have to be expended during the strike. SNET claimed to have incremental expenses of $16.9 million. Using SNET's figures, the company would not have made any profit, but would have suffered a loss of $3.7 million. When these costs were analyzed by the DPUC and argument was had by the parties to the docket, the DPUC draft concluded that one of the expenses claimed by SNET, $11.1 million in management overtime, was not appropriate.[2]
This charge (less $.3 million)[3] was disallowed and ordered returned to the customers as an unreasonable profit. (ROR, Number X-2.)
On May 12, 1999, the three DPUC commissioners assigned to the docket did not reach a unanimous vote. The matter was referred to the five commissioners for consideration. On July 9, 1999, the draft was defeated by a vote of three to two. An alternative proposal, different only in computation of what the DPUC concluded to be an "unreasonable profit" earned by SNET, was approved by a vote of three to two. Again, referring to OCC-1, the final decision used the figure of $13.2 million as SNET's reduced expenses. In scrutinizing SNET's incremental expenses, the DPUC first allowed $5.8 million for such items as food service, payments to outside vendors, security, and other miscellaneous charges that arose as costs to SNET during the strike. It allowed, as did the draft decision, an incremental expense for company costs in the amount of $.3 million. It was the overtime figure that changed in the final decision, as opposed to the draft. As seen above, the draft disallowed the overtime figure of $10.8 million entirely. In the final decision, management overtime was CT Page 2381 allowed, but only at a rate equivalent to the "friends and family" rate.[4] This meant that the overtime figure was put at $4.3 million. Therefore, the final decision concluded that the total incremental expenses were $10.1 million. Subtracting SNET's incremental expenses from its reduced expenses, the final decision concluded that SNET had made a profit of $2.8 million.
The DPUC concluded that the level of service quality was impaired and that SNET earned unreasonable profits; it issued an order requiring SNET to refund to its customers $2.8 million. This appeal followed.[5]
In deciding this appeal, the court follows the recognized standard for DPUC cases:
 [T]he scope of that review, the substantial evidence rule, is restricted. . . . Substantial evidence exists if the administrative record demonstrates a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . Judicial review of conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . .
 (Brackets omitted; citations omitted; internal quotation marks omitted.)
Connecticut Light Power Co. v. DPUC, 219 Conn. 51, 57-58 (1991); see also Samperi v. Inland Wetlands Agency, 226 Conn. 579, 587 (1993) ("Rather than asking the reviewing court to retry the case de novo . . . the plaintiff must establish that substantial evidence does not exist in the record as a whole to support the agency's decision. . . .") (Citations omitted.)
SNET's first ground of appeal is that § 16-8b does not apply to it as its pricing has been regulated since 1966 under § 16-247k, an alternative form of regulation that was added to the statutes after § 16-8b was passed.[6] SNET argues that since the alternative format does not directly involve rate of return computations, § 16-8b
does not apply to it, as § 16-8b is a rate-based statute. The court need only look to the language of § 16-8b to resolve this claim CT Page 2382 against SNET. The statute states plainly that it applies to public service companies as defined in General Statutes § 16-1. SNET admits in its appeal that it is a public service company. (Appeal, p. 1.) Section 16-1(4) defines a public service company to include telephone companies owning, leasing, maintaining, operating, managing or controlling plants or parts of plants or equipment. . . ." Because the language of the statute is clear, the court need not look further than the words of the statute itself. Office of Consumer Counsel v. Dept. ofPublic Utility Control, 246 Conn. 18, 29 (1998).
Even if the court were to look to the legislative history, SNET's position cannot be supported. It is true that in 1987 the proponents of the legislation made use of the phrase "rate of return" throughout the debate in the House and Senate. This was due to the fact, however, that the alternative rate-making approach was not in existence until 1994. The intent of the legislature was expressed as follows: "[A] number of people were concerned, number one, about the quality of service that people, customers received during [a recent] strike and number two, whether there was any advantage to the company to not have the labor costs during that period of time and so we were asked by both members, workers within the company and customers to examine that situation. So that's why the bill was necessary and why we wanted to look into this, to make sure there were no taking advantage by any company of this kind of situation." 30 H.R. Proc., Pt. 7, 1987 Sess., p. 2412, remarks of Representative Del Bianco.
When the General Assembly passed § 16-247k to "encourage" the adoption of alternative rates, the proponent remarked that the legislation was an historic effort to allow public utilities to take advantage of the latest technology. 37 S. Proc., Pt. 7, 1994 Sess., p. 2393, remarks of Representative Fonfara. The plaintiff has not made its case that the alternative form of regulation in and of itself was intended by the legislature to repeal § 16-8b, a so-called "consumer protection" law passed for a specific purpose. The court must attempt to harmonize the provisions of the General Statutes. As Justice Peters declared in Nash v. Yap, 247 Conn. 638, 648 (1999): "[I]mplied repeal of a statute is not favored and will not be presumed where, as here, the old and new statutes can co-exist peaceably. . . ." (Citations omitted.)
SNET argues in its brief and supplemental memorandum that to allow § 16-8b to apply to a company subject to the alternative regulation plan would be an improper delegation of power to an agency under State v.Stoddard, 126 Conn. 623 (1940). It claims that the DPUC has no mechanism to make the determination of "unreasonable profits" under the alternative regulation plan and any attempted regulation would be standardless. CT Page 2383
To the contrary, "[i]n testing the constitutionality of a statute for the adequacy of its standards, the character of the administrative action which it authorizes must be considered. [The DPUC's determination of what is an "unreasonable profit"] must of necessity allow for substantial flexibility; this need is inherent in the very subject matter with which [DPUC] is empowered to deal under the act. This court has stated that it is unrealistic to demand detailed standards which are impractical or impossible." Wilson v. Connecticut Product Development Corporation,167 Conn. 111, 122 (1974). The broad discretion the DPUC has in setting rates rebuts SNET's contention. As the Supreme Court stated in DuquesneLight Co. v. Barasch, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646
(1989): "The economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result. The Constitution is not designed to arbitrate these economic niceties" Id., 314. "The Constitution within broad limits leaves the States free to decide what rate setting methodology best meets their needs in balancing the interests of the utility and the public." Id., 316.
The court, having concluded that § 16-8b applies to SNET, will address next whether the DPUC properly determined that as a result of the strike, the quality of service to customers was "impaired." SNET contends that through its efforts, service during the strike period was satisfactory and certainly not "impaired." In the legislative history for § 16-8b, Representative Del Bianco noted that the fact that the service provided by the public utility has "changed" due to the strike, should be of concern to the DPUC. 30 H.R. Proc., Pt. 7, 1987 Sess., p. 2414. Senator Spellman referred to a "difference in expected service. 30 S. Proc., Pt. 4, 1987 Sess., p. 1170. Thus, the term "impaired" was intended by the legislature to mean a change or difference in service levels. The issue becomes one of substantial evidence under the standards set forth above, and the court concludes that the record supports the DPUC's finding of impairment.
The DPUC's decision herein contains a table indicating the quality of service performance of SNET compared to established minimum quality of service standards of SNET's alternative regulation plan. The table compares each category for the months of July, August, September, October, November and December, 1998. (ROR, Number XII-1, p. 19.) It is evident that SNET failed to satisfy the approved level of service in every category during the period of the strike. Section 16-8b requires, as the legislative intent makes clear, only that the quality of service be impaired, not that the service be "substantially" or "severely" or in any other fashion impaired.
The record shows that "call answer waiting time" and "call abandoned rates" increased considerably. (ROR, Number VII-2, pp. 245-46.) Service CT Page 2384 orders were signed off as complete and finished, but no one had been dispatched to service the order. (ROR, Number VII-2, pp. 251-512.) Some customers complained that they were not able to place an order during the strike, others that they were given due dates of December 1, 1998, and some were told that they were not in the system when they called back to check on the status of their orders. (ROR, Number VII-2, pp. 255-58.) This evidence in the record "affords a substantial basis of fact from which the fact in issue can be reasonably inferred." Connecticut Light Power Co. v. DPUC, supra, 219 Conn. 639. The court concurs in the DPUC's assessment that service to customers was impaired.
The next question is whether, due to the strike, SNET earned "unreasonable profits." SNET first contends that there were no "profits" here, but a loss of $3.7 million. The legislature intended that the DPUC calculate the profit by taking the gross amount not expended by SNET on payment of wages (wages saved) and subtracting from that figure the amount expended on legitimate additional costs due to the strike. In an exchange between Representatives O'Neill and Del Bianco, it was agreed that "the DPUC will go into all records, the amount of money it cost for overtime, the amount of money for hiring extra employees and all of those things." 30 H.R. Proc., Pt. 7, 1987 Sess., p. 2415. Representative Adamo also remarked: "The judgment on the return of money or if unreasonable profits were there . . . is going to be made by the DPUC. They have a set of regulations by which they set the rates, and those regulations will apply, and I believe that their judgment would be made on everything being taken into consideration, including Rep. Fan's thoughts about overtime costs." 30 H.R. Proc., Pt. 7, 1987 Sess., p. 2434. "Because certainly there are overtime costs on a strike because they were working management people around the clock. Obviously they're going to be taking into consideration, and reduced to come up with a net number." (Emphasis added.) 30 H.R. Proc., Pt. 7, 1987 Sess., p. 2434.
The DPUC calculations in this instance were reviewed in open court and are supported by substantial evidence based upon OCC-1. As indicated above, the gross savings to SNET were $13.2 million. The record supports and the parties agree on an additional $5.8 million being subtracted from the gross savings.[7] This leaves in controversy the figure of $11.1 million in overtime payments to managers, who worked their regular forty hours and then served another twenty hours per week filling in for the strikers. The parties are not in dispute on $.3 million of this amount as properly paid.[8] This leaves the figure of $10.8 million in management overtime payments in dispute, with SNET contending that this entire amount should be allowed as a cost, while the DPUC majority allowing only a portion of these expenses and OCC and the DPUC minority seeking to disallow the entire amount.[9]
CT Page 2385
SNET first argues that the management was entitled to overtime at the management rate because federal wage law requires this amount to be paid. SNET is correct that under Brennan v. Western Union Telegraph Co.,561 F.2d 477 (3rd Cir. 1977), the Department of Labor received tentative authority to bring suit against a company to mandate payment to management employees for their overtime hours during a strike. In a subsequent review of a District Court order entering a judgment against the company, the Court of Appeals reversed this order. Marshall v.Western Union Telegraph Co., 621 F.2d 1246 (3d Cir. 1980). Marshall
emphasized that the imposition of costs on management involved factual determinations such as whether the managerial exception applied under a "long test" or a "short test." An inquiry was to be made into the primary duties of the management employees. Id., 1249.[10]
When the issue was presented to the DPUC[11], it concluded as follows:
 The Department has reviewed the Holding Company's argument [SNET's parent company] and subsequent responses of the OCC, AG and Union as well as the cited case law. The case law appears to support the argument that most managerial employees would not necessarily have lost their exempt status. Accordingly, the Department has determined that there is insufficient evidence in the record of this proceeding to support the Holding Company's contention that it may have been required to pay all of its management employees overtime pay during the strike, with the exception of certain employees required to be paid overtime in accordance with their employment contracts.
(ROR, Number XII-1, p. 17.) This determination by the DPUC is adopted by this court as it is a finding entitled to agency deference. Presnick v.Freedom of Information Commission, 53 Conn. App. 162, 164 (1999) (correct application of law to facts found.)
SNET further argues that it was "rational and prudent" to pay the overtime costs based on the demands placed upon the managers during the strike, evidence of harassment by the union members, and the stress under which the managers operated in handling both their own jobs and other non-managerial jobs. On the other hand, the evidence in the record indicates that, under normal conditions, only a small number of SNET's management employees were entitled to overtime pay. Because of other benefits, it was expected that managers work until their tasks were completed. (ROR, Number VII-1, pp. 43-44, 144-46.) The DPUC, in its final decision, did take into account some of the factors cited by SNET for CT Page 2386 paying overtime when it normally was not paid to managers. At the same time, the DPUC did not consider reasonable the compensation rate paid to the managers. This rate was set at $50 per hour by the "human resource folks" of SNET. (ROR, Number VII-6, pp. 392-96.) The DPUC concluded that "the reasonable value of such services is the straight-time hourly rate that was, in fact, paid to non-management, non-bargaining unit individuals hired to perform such services during the strike." (ROR, XII-1, p. 18.)
The determination of whether to allow costs for management overtime and at what rate is particularly a matter left by § 16-8b to the discretion of the DPUC. It was repeatedly stressed in the legislative history cited above that the DPUC is to make an independent judgment on the appropriate costs to be allowed against the savings resulting to SNET because of the work stoppage. It would be entirely inappropriate for this court to substitute any other methodology or conclusion for the DPUC's result. Because OCC's appeal, Docket No. 497806, seeks to reach a different conclusion on overtime payments — to disallow them all — and the court has rejected its contentions for the reasons stated above, its appeal must be dismissed.[12]
As the court has found that the DPUC correctly determined that the management overtime costs were permissible, and with the rate at which these costs were to be paid, it follows that the DPUC was also correct in "adding the reasonable amount of compensation for management overtime, as determined above, to the other Department-approved incremental costs incurred during the strike period."[13] (ROR, Number XII-1, p. 18.) This result was netted against the savings to produce a profit of $2.8 million.
As indicated, the court finds that under the standard of review the DPUC has appropriately concluded that there was not a loss as SNET argues, but there was a net gain to SNET of $2.8 million. This should not end the inquiry, however, because § 16-8b allows for remedial orders when the DPUC finds two events jointly occurring as a result of a work stoppage: (1) impairment of service; and (2) the earning of unreasonable profits. As Representative Joyce stated in the debate on the passage of the statute, the public utility should not make "a windfall profit" atthe same time that service is impaired. 30 H.R. Proc., Pt. 7, 1987 Sess., p. 2426.
The court has concluded that the DPUC properly found an impairment of service, but it must now search the record to see if the DPUC correctly determined that the profit of $2.8 million was "unreasonable." It is clear both from the legislative history and the case law that the term "unreasonable" is equivalent to "excessive." In explaining the CT Page 2387 legislation, Representative Del Bianco states: "I believe that through the rate setting process, public utility companies are allowed a certain rate of return. If, as a result of a work stoppage their rate of return is in excess of what they are allowed, then I think that's what the DPUC would examine and that's where the DPUC might make a determination as to whether there needs to be some refund to the customers who were affected during that work stoppage." (Emphasis in original.) 30 H.R. Proc., Pt. 7, 1987 Sess., pp. 2413-14. The case of In Re Public Utility Commissionerof Oregon, 268 P.2d 605, 624 (Or. 1954) declares: "The term `unreasonable' [has] the connotation of excessive." Thus, the DPUC was obliged to set forth in its decision why the profit of $2.8 million was excessive. See Airmotive Engineering Corp. v. United States, 535 F.2d 8
(Court of Claims, 1976) (excessive profits under renegotiation act).
The record does not contain sufficient evidence of why the DPUC concluded that SNET's profit as a consequence of the strike was "unreasonable" or "excessive."[14] In its decision, the agency proceeds from its downward adjustment to overtime costs, (findings of fact, ¶¶ 3-6), to its net result of $2.8 million, (finding of fact, ¶ 7), to its final conclusion that these profits were "unreasonable." It is insufficient to state that the overtime costs support a conclusion that SNET earned "unreasonable" profits. The DPUC has already found it appropriate for SNET to pay some overtime costs, just not at the rate that SNET sought. (ROR, Number X-II, pp. 18, 22.) The excessive overtime payments have been netted out in reaching the $2.8 million figure.
This case must therefore be remanded for the DPUC to determine whether the $2.8 million profit earned as a result of the strike constituted an "unreasonable" profit such that a remedial order was appropriate. The court will not attempt to dictate to the DPUC on the methodology it develops to determine whether SNET has earned an unreasonable profit here, especially in light of the fact that SNET falls under the Alternative Regulation Plan of § 16-247k. Connecticut Light Powerv. DPUC, supra, 219 Conn. 57-58. There is precedent for this process at the DPUC which the DPUC might elect to apply in this case. See "DPUC Investigation Into the Effect of the Work Stoppage at Yankee Gas Service Company on Service and Profits," Docket No. 93-01-16 (June 30, 1993).
The court will state, however, that it concurs with the DPUC that it has the authority to issue a remedial order, if it concludes that there were in fact "unreasonable" profits. The court therefore rejects SNET's contention that the DPUC must equate the phrase "earnings in excess" as used in § 16-247k(c)[15] with the phrase "unreasonable profits" of § 16-8b. These two phrases cannot be arbitrarily drawn together from statutes with separate goals. Section 16-247k is a non-traditional approach to price-setting which may be adopted by a public utility, while CT Page 2388 § 16-8b is a "pro-consumer" statute seeking to regulate the consequences of a work stoppage. As indicated above, the legislature did not intend the innovations of § 16-247k to render the provisions of § 16-8b meaningless. Hartford Hospital v. Dept. of ConsumerProtection, 243 Conn. 709, 718 (1998).
The court therefore sustains SNET's appeal, Docket No. 497867, and remands the case for further proceedings at the DPUC in accordance with this decision. The court dismisses the appeal of the OCC, Docket No. 497806, for the reasons stated above.
Henry S. Cohn, Judge