**Robert REICH, Secretary of Labor, United States Department of Labor** [1]

v.

**NEWSPAPERS OF NEW ENGLAND, INC., d/b/a The Concord Monitor; George Wilson.**

**Civ. No. 81–298–SD.**

United States District Court, D. New Hampshire.

Nov. 3, 1993.

1. Robert Reich, current Secretary of Labor, is automatically substituted as party plaintiff pursuant to the provisions of Rule 25(d)(1), Fed. R.Civ.P.

John S. Casler, USDL, Boston, MA, for plaintiff.

Edward E. Shumaker III, Concord, NH, David S. Barr [amicus, Newspaper Guild], Washington, DC, for defendants.

## OPINION AND ORDER

DEVINE, Senior District Judge.

In wage-and-hour parlance, qualified employees may be exempted from the overtime pay requirements of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.* Whether certain newspaper reporters, editors, and photographers are so exempt is the issue herein addressed.

Because inquiry into exempt status under FLSA "remains intensely factbound and case specific," [2] the resolution of the issue here addressed is necessarily of limited precedential value.

---

**2.** *Dalheim v. KDFW–TV*, 918 F.2d 1220, 1226 (5th Cir.1990), *aff'g,* 706 F.Supp. 493 (N.D.Tex. 1988).

### 1. Background

The defendant Newspapers of New England, Inc. (d/b/a *The Concord Monitor*) (*Monitor*), publishes an award-winning small-city newspaper which is sited in the capital city of New Hampshire. In late 1979 and early 1980, the Department of Labor (DOL) conducted an investigation of the pay practices in *Monitor*'s newsroom. Perceiving that certain newsroom employees were not being paid overtime which it believed to be due them, DOL commenced this litigation.

For most of *Monitor*'s reportorial staff, this employment was their first in the field of journalism. Although they possessed undergraduate college degrees, at least half of the reporters had majored in fields other than journalism. Indeed, the defendant's managing editor took his undergraduate degree in American studies and his initial graduate work in history.

When hired, *Monitor*'s reporters were assigned to tasks ranging from feature writing to the coverage of legislative, municipal, and town governments and agencies. Some of their work was of a routine nature, such as compiling lists of the titles and times of local showings of motion pictures.

Coverage of legislative sessions and meetings of the city council often caused the reporters assigned to these events to work more than 40 hours weekly. Although weekly time cards were collected for each newsroom employee, the *Monitor* discouraged overtime, and suggested that those who worked more than 40 hours should seek compensatory time in lieu of overtime. At least three of the witnesses who testified had been told by their superiors to alter the time cards submitted to reduce the amount of overtime hours originally listed therein.

On other occasions, time cards for a given employee were completed by another co-employee, who necessarily was not possessed of accurate information as to the actual hours worked by the person whose time card was being completed. In light of these circumstances, many of the newsroom employees did not bother to prepare and file an accurate recordation of all hours, including overtime, worked weekly.

### 2. Discussion

The overtime provisions of FLSA mandate that employees subject to its terms who are required to work more than 40 hours weekly shall be compensated for the hours worked in excess of 40 hours "at a rate not less than one and one-half times the regular rate at which [such employee] is employed." 29 U.S.C. § 207(a)(1). Exempted from this requirement, however, are the classifications of employees "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).

Defendants contend that the *Monitor*'s reporters, editors, and photographers fell within the "professional" exemption of 29 U.S.C. § 213(a)(1). This classification of an exempt employee is not further defined in the statute. However, the regulations of the DOL provide such information.

The term 'employee employed in a bona fide ... professional capacity' in section 13(a)(1) of the Act shall mean any employee:

(a) Whose primary duty consists of the performance of:

(1) Work requiring knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes.... (and)

(b) Whose work requires the consistent exercise of discretion and judgment in its performance; and

(c) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; and

(d) Who does not devote more than 20 percent of his hours worked in the workweek to activities which are not an essential part of and necessarily incident

to the work described in paragraphs (a) through (c) of this section; and

(e) Who is compensated for services on a salary or fee basis at a rate of not less than $170 per week ... exclusive of board, lodging, or other facilities....

*Provided further,* That an employee who is compensated on a salary or fee basis at a rate of not less than $250 per week ... exclusive of board, lodging, or other facilities, and whose primary duty consists of the performance either of work described in paragraph (a)(1) or (3) of this section, which includes work requiring the consistent exercise of discretion and judgment, or of work requiring invention, imagination, or talent in a recognized field of artistic endeavor, shall be deemed to meet all of the requirements of this section.

29 C.F.R. § 541.3 (1975).

And, although the term "professional" as used in the regulations is not restricted to the traditional professions of law, medicine, and theology, it does require that the "profession" at issue "have a recognized status [and be] based on the acquirement of professional knowledge through prolonged study." 29 C.F.R. § 541.301 (1975). And there is a category of "artistic professions" involving work which "is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee." 29 C.F.R. § 541.303(a) (1975).

In general, however,

The field of journalism also employs many exempt as well as many nonexempt employees under the same or similar job titles. Newspaper writers and reporters are the principal categories of employment in which this is found.

(1) Newspaper writers, with possible rare exceptions in certain highly technical fields, do not meet the requirements of § 541.3(a)(1) for exemption as professional employees of the 'learned' type. Exemption for newspaper writers as professional employees is normally available only under the provisions for professional employees of the 'artistic' type. Newspaper writing of the exempt type must, therefore, be 'predominantly original and creative in character.' Only writing which is analytical, interpretative or highly individualized is considered to be creative in nature. (The writing of fiction to the extent that it may be found on a newspaper would also be considered as exempt work.) Newspaper writers commonly performing work which is original and creative within the meaning of § 41.3 are editorial writers, columnists, critics, and 'top-flight' writers of analytical and interpretative articles.

(2) The reporting of news, the rewriting of stories received from various sources, or the routine editorial work of a newspaper is not predominantly original and creative in character within the meaning of § 541.3 and must be considered as nonexempt work. Thus, a reporter or news writer ordinarily collects facts about news events by investigation, interview, or personal observation and writes stories reporting these events for publication, or submits the facts to a rewrite man or other editorial employees for story preparation. Such work is nonexempt work. The leg man, the reporter covering a police beat, the reporter sent out under specific instructions to cover a murder, fire, accident, ship arrival, convention, sport event, etc., are normally performing duties which are not professional in nature within the meaning of the act and § 541.3.

(3) Incidental interviewing or investigation, when it is performed as an essential part of and is necessarily incident to an employee's professional work, however, need not be counted as nonexempt work. Thus, if a dramatic critic interviews an actor and writes a story around the interview, the work of interviewing him and writing the story would not be considered as nonexempt work. However, a dramatic critic who is assigned to cover a routine news event such as a fire or a convention would be doing nonexempt work since covering the fire or the convention would not

be necessary and incident to his work as a dramatic critic.

29 C.F.R. 541.303(f) (1975).

The earliest newspaper challenge to this regulatory scheme was unsuccessful. *Sun Publishing Co. v. Walling*, 140 F.2d 445, 449 (6th Cir.), *cert. denied*, 322 U.S. 728, 64 S.Ct. 946, 88 L.Ed. 1564 (1944). The marked post-war improvements in communications technology have sparked further such challenges, the results of which have been mixed. *E.g.*, *Sherwood v. The Washington Post*, 677 F.Supp. 9 (D.D.C.1988) (on cross-motions for summary judgment, *held* 13 reporter editors were professionals not entitled to overtime pay), *rev'd*, 871 F.2d 1144 (D.C.Cir.1989) (genuine issues of material fact precluded the granting of summary judgment); *Dalheim, supra* (TV station reporters, producers, directors, and assignment editors non-exempt from overtime requirements of FLSA); *Freeman v. National Broadcasting Co.*, 1993 WL 330341, 1993 U.S.Dist. LEXIS 11,712 (S.D.N.Y. Aug. 20, 1993) (broadcast news employees not exempt as professionals or administrators).

■ It is well established that the employer in an FLSA case bears the burden of proving that its employees are entitled to exemptions. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974); *Secretary of Labor v. De Sisto*, 929 F.2d 789, 797 (1st Cir. 1991). And such exemptions are to be narrowly construed as against the employer. *Arnold v. Ben Kanowsky*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960).

■ The defendants contend that the regulations at issue are out of date and, accordingly, should be given scant weight. Defendants argue that such approach is warranted by *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), and certain of its progeny.

*Skidmore* concerned a claim for overtime brought by certain employees, paid weekly salaries for daytime employment, but required to be present or nearby the employer's premises for evening fire guard duty. In discussing the weight to be given the administrative fiats of the Administrator of Wages and Hours, the Court said,

We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Id.*, 323 U.S. at 140, 65 S.Ct. at 164.

The above-quoted language furnishes a court with no inkling that the *age* of the regulations detracts from their *applicability*. And review of the other authorities cited by the defendants is equally nonpersuasive.

In *Davis Bros., Inc. v. Donovan*, 700 F.2d 1368, *reh'g denied*, 708 F.2d 734 (11th Cir. 1983), the issue was whether the employer, a restaurant and motel chain, was entitled to credit against the minimum wage the reasonable cost of meals furnished to its employees. The court held that the regulation promulgated by the Secretary of Labor conflicted with the statute it was designed to interpret, and thus the regulation was disregarded.

And, in *Marshall v. Western Union Tel. Co.*, 621 F.2d 1246 (3d Cir.1980), the flaw found by the court lay not in the age of the challenged regulation, but in an interpretation thereof by the Secretary. The court held such interpretation to be an attempt at substantive amendment of the regulation, which amendment would require compliance with the rulemaking provisions of the Administrative Procedure Act, 5 U.S.C. § 553.

Finally, *Wirtz v. Steepleton Gen. Tire Co.*, 330 F.2d 804 (6th Cir.1964), *rev'd sub nom.*, *Idaho Metal Works v. Wirtz*, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966),[3] the "in-

---

**3.** The *Steepleton* case was consolidated with and argued with the *Idaho Metal Works* case. *See*

383 U.S. 190 n. *, 86 S.Ct. 737 n. *.

terpretative bulletin" at issue was declared flawed because it failed to conform with the customary habits and practices of the tire industry, which habits and practices had been in existence long before the issuance of the interpretative bulletin.[4]

Defendants also rely upon, and indeed examined, a number of witnesses concerning the descriptions of the work of newspaper employees as set forth in the April 1982 edition of the *Occupational Outlook Handbook*. Defendants' Exhibit 13 for ID. Unfortunately, this document is similarly unpersuasive, for in a "note" found at page v thereof, it is stated, "The *Handbook*, therefore is not intended and should not be used as a guide for determining wages, hours, the right of a particular union to represent workers, appropriate bargaining units, or formal job evaluation systems."

### a. "Learned" Professionals

■ As hereinabove set forth, a relevant regulation, 29 C.F.R. § 541.3(a)(1), *supra*, at 4, describes exempt work to be that which requires "knowledge of an advanced type in a field of science or learning customarily acquired by a *prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education*." (Emphasis added.) Moreover, a profession must "*have a recognized status [and be] based on the acquisition of professional knowledge through prolonged study*." 29 C.F.R. § 541.301, *supra*, at 6 (emphasis added).

The record before the court demonstrates that a good liberal arts education and an ability to think and write clearly form the foundation for success in journalism. The

plaintiff's expert, Dean Ben Bagdikian,[5] testified that there was "no body of scholarly work which a journalist is required to know before the journalist may practice." Tr. 8–22.[6] Journalism requires skill in observation, good judgment in selection of things observed, and the ability to write clearly. *Id.*

As of the time of Dean Bagdikian's testimony, sixty percent of current journalists were not possessed of degrees in journalism. Tr. 8–72. A 1977 *Atlantic Monthly* article which he authored reported his research on journalists who had won Pulitzer Prizes. *Id.* at 24. Most of them had not attended schools of journalism. *Id.*

Dean Robert Neal Copple[7] testified as an expert for the defendant. He stated that "the accrediting philosophy in journalism education" is the need of journalists "of all people, to have a liberal arts education." Tr. 6–98. He described the reasons for such need to be (1) that liberal arts courses provide the information that "literally become the tools of working journalists," and (2) that such courses provide the background which enables journalists "to know where to start asking questions." Tr. 6–99.

And Malcolm Mallette,[8] another expert of the defendants, equated "any liberal arts education" with a "specialized course of intellectual instruction or study." Tr. 4–109. He interpreted the term "special instruction" to mean "generalness". Tr. 4–93.

Two of the defendants' purported examples of "learned professionals" were Lila Locksley and Rochelle Sharpe. An English honors graduate of Wellesley College, Ms. Locksley, who had long desired a journalistic career, deliberately chose not to attend a college which offered courses in journalism.

---

4. In reversing *Steepleton*, the Court found that the industry usages could not prevail as against the Secretary's guidelines. 383 U.S. at 208–09, 86 S.Ct. at 748–49.

5. As of the time of his testimony, the plaintiff's expert was Dean of the Graduate School of Journalism at the University of California at Berkeley.

6. The term "Tr." followed by Arabic numerals has reference to the volume and page of the trial transcript.

7. As of the time of his testimony, Dean Copple was the Dean of the College of Journalism at the University of Nebraska at Lincoln.

8. As of the time of his testimony, Mr. Mallette was Director of Development at the American

Plaintiff's Exhibit 3, at 185.[9] She knew that education in journalism was not required for such a career and wished to get "the best education I could at an interesting place." *Id.* at 185–86.

Ms. Sharpe, a psychology major at Yale University, similarly chose to matriculate at a college which had no journalism school. Plaintiff's Exhibit 5, at 6, 10.[10] Her dual reasons were (1) the lack of need for such background to survive in journalism and (2) the importance of exposure to various liberal arts courses. *Id.*

The defendants' approach to the issue of "learned professionals" would have the court substitute the words "or a general academic education" for "a prolonged course of specialized instruction and study, as distinguished from a general academic education." 29 C.F.R. § 541.3(a)(1), *supra*, at 4. The court finds that the preponderance of the evidence neither supports nor warrants such a substitution. Accordingly, the court finds that none of the defendants' employees here at issue fall within the exemption for "learned professionals".

### b. "Artistic" Professionals

Edmund Arnold was the defendants' expert in graphic design. His specialty is newspaper layout. At times, he waxed eloquent.

One opinion voiced by Arnold was that any employee of the *Monitor* "who is at all included in transmitting information that is editorial information is involved in a creative process." Tr. 4–151. This category could include photographers, graphic artists, and every editor making use of a photograph. Tr. 4–152–53.

Indeed, this witness compared the work of such newsroom employees favorably with that of painters, Tr. 4–180, sculptors, Tr. 4–181, music composers, Tr. 4–181–82, and agency ad writers, Tr. 4–182. The comparison was similarly favorable to machinery and clothing designers, Tr. 4–184, cartoonists, Tr.

4–186–87, and experienced tool-and-die makers, Tr. 4–187–88, and editorial layout was equated with painting and photography, Tr. 4–190.

Managing Editor Price was equally effusive. His reportorial staff was said to be equally creative with sculptors, Tr. 9–106–07, and landscape or portrait painters, Tr. 9–109, and more creative than actors, Tr. 9–107–08, orchestra conductors, Tr. 9–108–09, violinists or saxophonists employed by the Boston Symphony Orchestra, Tr. 9–109–11, and clothing designers, Tr. 9–110.

Malcolm Mallette joined the chorus of praise. Reduced to simple terms, his opinion was that the defendants' newspaper employees were persons of great artistic talents. Tr. 4–95–97.

While admittedly impressive, such testimony overlooks the basic requirement that exempt newspaper writing be "predominantly original and creative in character." 29 C.F.R. § 541.303(f) (1975). It is only writing "which is analytical, interpretive, or highly individualized" that falls within this definition. *Id.*

There is no question but that some of the work product of the employees presented as evidence at trial demonstrated creativity, invention, imagination, and talent. But the bulk of such evidence is not of this ilk. Otherwise put, the preponderance of the evidence fails to demonstrate that the daily work of *Monitor* employees qualified them for designation as "artistic" professionals.

A few examples should suffice. Presented with the issue of the *Monitor* published on the day of his appearance, June 9, 1986, Dean Copple was unable to identify a single piece of writing therein which was "original or creative in character in a recognized field of artistic endeavor." Tr. 7–6–29. In rebuttal, Editor Pride testified that as this issue was published on a Monday, it was not a representative issue of the *Monitor*. Tr. 9–6, 7. However, Monday publications were not

Press Institute.

**9.** Ms. Locksley's testimony was proffered by deposition, and her deposition is Plaintiff's Exhibit 3.

**10.** Ms. Sharpe's testimony similarly was introduced by medium of deposition. Her deposition is Plaintiff's Exhibit 5.

excepted from the favorable comparisons made by this witness of his employees with sculptors, musicians, and painters.

Defendants suggest that a single edition would be insufficient for decision. Tr. 9–68. But Defendants' Exhibit 66 [11] was the only writing supplied to support the artistic exemption status of Eileen Pollack.

When those superb pieces were written, however, Ms. Pollack was not a full-time employee of the *Monitor*. Tr. 3–165. Rather, she was "free-lancing" and "took an enormous amount of time to research this." *Id.* Its "writing took two weeks, every day." *Id.*

David Olinger refused to acknowledge that his previous employment at the *Monitor* was "of a highly specialized character." Defendants' Exhibit 103,[12] at 64–66, 70–71. Nor would he agree that his writing for the *Monitor* was interpretative. *Id.* at 104. He distinguished the "nuts and bolts" of his work from that of the paper's columnists. *Id.* at 77, 143–45.

With reference to editorial employees, Lila Locksley, Plaintiff's Exhibit 3, at 42–46, 60; Nancy Druelinger, Plaintiff's Exhibit 4,[13] at 22–32, 58–59; and Sharon Goss, Tr. 1–34–37, 117, 119, testified that most of their work for the *Monitor* was clearly *not* "original and creative in character in a recognized field of artistic endeavor." 29 C.F.R. § 541.3(a)(2) (1975).

Additionally, the record does not support the defendants' contention that all news photography is art. Approximately 70 percent of Tom Sobolik's photography was assigned. Plaintiff's Exhibit 2,[14] 26–27. He had no input as to which photos would be used in the newspaper. *Id.* at 33. Acknowledging that there were creative aspects to photojournalism, he stated that "a large proportion of it is pretty run-of-the-mill and pretty standardized." *Id.* at 50, 58–62.

At relevant times, Ken Williams spent most of his time shooting sports, exteriors

and interiors of buildings, and politicians. Tr. 1–146. More than 50 percent of his time was spent in the developing of photos in the darkroom. *Id.* He denied that news photography equated with the "personal statement" that is art because "a news photographer tries to photograph reality, as it happens, without embellishment, without taking sides." *Id.* at 148.

In short, the proof submitted on this issue failed to demonstrate that any of the defendants' employees met the qualification requirements of exemption as "artistic" professionals set forth in 29 C.F.R. §§ 541.3(a)(2), 541.303(f) (1975).

### c. Willfulness

■ The complaint herein was filed on June 22, 1981. The statute of limitations under FLSA is generally two years, but "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a).

Not surprisingly, the plaintiff contends that the circumstances of this case bring it within the three-year extension of the statute. The defendants strenuously argue that the two-year limitation applies.

■ A violation of the FLSA cannot be considered willful unless the employer acts not only unreasonably but also recklessly. *Lopez v. Corporacion Azucarera de Puerto Rico*, 938 F.2d 1510, 1515 (1st Cir.1991) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 n. 13, 108 S.Ct. 1677, 1682 n. 13, 100 L.Ed.2d 115 (1988)).

While it is here arguable that the defendants were unreasonable in not more strictly policing the accuracy of the time cards, the preponderance of the evidence does not support a finding that they acted recklessly. This is particularly true in light of the closeness of the findings in the more recent cases

---

**11.** Defendants' Exhibit 66 is a series of writings which track a brain tumor patient through diagnosis, surgery, and recovery.

**12.** Mr. Olinger testified by deposition, and his deposition is Defendants' Exhibit 103.

**13.** Ms. Druelinger also testified by deposition, and her deposition is Plaintiff's Exhibit 4.

**14.** Mr. Sobolik also testified by deposition, and his deposition is Plaintiff's Exhibit 2.

concerning exemptions for those who write and edit for the media.

Accordingly, the damages recoverable are here limited to a period which commenced on June 22, 1979. The court further finds that the damage window would close on January 25, 1980.

The reason for this latter limitation is that, although plaintiff claims "continuing" violations of FLSA, the case was largely prepared by the defendants on the ground that violations, if any, did not continue beyond January 25, 1980. The court, having taken the matter under advisement, Tr. 1–43, 44, finds and rules that it would be unjust and inequitable to allow damages to be recovered for a period beyond January 25, 1980. *Donovan v. Burger King Corp.*, 672 F.2d 221, 229 (1st Cir.1982).

### d. Damages

#### (1) Measurement of Damages

The investigating compliance officer for DOL, Scott Wilkinson, was given access to *Monitor*'s payroll records. Tr. 8–125. He also interviewed *Monitor* employees personally, telephonically, and via mail. Tr. 8–147–48, 153–54, 161–62.

Because he was unable to contact all of *Monitor*'s newsroom employees, Mr. Wilkinson devised a formula for the calculation of the overtime payments due them. Tr. 8–154–58. The basis of this formula was 3.2 hours per week for reporters and 8 hours per week for editors. Tr. 8–157; Plaintiff's Exhibit 7 for Identification (ID).[15]

For some of those *Monitor* employees who testified either personally or by medium of deposition, Mr. Wilkinson recomputed his calculations of overtime. Tr. 8–164–67; Plaintiff's Exhibit 8 for ID.[16] Mr. Wilkinson conceded that the latter computations were more accurate. Tr. 8–167–68.

The court finds and rules that, under the circumstances hereinabove detailed, it can and will compute damages only for those *Monitor* employees whose sworn testimony is available to it.[17] Overtime pay will be calculated at one and one-half times the regular rate of pay.

Paul Carrier was working 1.5 hours of overtime per week. Tr. 8–176–81; Plaintiff's Exhibit 12. For the 4–week period between June 22, 1979, and July 21, 1979, his weekly pay rate was $265, or $6.625 per hour. For the 13 weeks between July 21 and October 22, 1979, his weekly pay was $280, or $7 per hour. His weekly rate for the 14 weeks from October 22, 1979, to January 25, 1980, was $295, or $7.375 per hour.

Mr. Carrier was paid 11 hours of overtime in the third quarter of 1979 and 20 hours of overtime in the fourth quarter of that year. Plaintiff's Exhibit 7 for ID. The overtime payment due him is in the total amount of $163.88.[18]

---

15. Plaintiff's Exhibit 7 comprises sheets entitled "Wage Transcription and Computation", which computations were apparently made by Mr. Wilkinson for various employees of the defendants. Because they contain computations based on the Wilkinson "formula", the court sustains the defendants' objection to the admission of the documents as a full exhibit. However, insofar as they contain information taken from the business records of the *Monitor*, such as the overtime hours actually paid the employees at issue, the court finds that the exhibits may be admissible for that limited purpose.

16. Plaintiff's Exhibit 8 For Identification comprises the individual sheets of the Wilkinson recomputations. For reasons unclear, these exhibits do not repeat the actual hours of over-time worked, which were taken from the business records and detailed in Plaintiff's Exhibit 7 For Identification.

17. Some of those employees, such as Nancy Druelinger and Roger Talbot, were not employed at the *Monitor* during the June 22, 1979, to January 25, 1980, period.

18. The court allocates 3 of the 11 third-quarter hours to the 4–week period between June 22 and July 21, 1979. The remaining 8 hours of that quarter, plus 4 of the 20 hours from the fourth quarter, are allotted to the 13–week period between July 21 and October 22, 1979. The remaining 16 hours of the fourth quarter are allotted to the 14–week period between October 22, 1979, and January 25, 1980. The computation is as follows:

| | |
|---|---|
| 4 weeks × 1.5 = 6 hours − 3 = 3 × $9.9375 = | $29.8125 |
| 13 weeks × 1.5 = 19.5 hours − 12 = 7.5 × $10.50 = | 78.75 |
| 14 weeks × 1.5 = 21 hours − 16 = 5 × $11.0625 = | 55.3125 |
| Total | $163.88 |

Sharon Goss worked 4 hours of overtime per week during the 23 weeks between June 22, 1979, and December 2, 1979. Tr. 1–21, 22. For the 8–week period between June 22, 1979, and August 20, 1979, her weekly rate was $185, or $4.625 per hour. For the 20–week period between August 20, 1979, and January 7, 1980, her weekly wage was $200, or $5 per hour. For the 4 weeks between January 7, 1980, and January 25, 1980, she was paid $215 per week, or $5.375 per hour.

For the 8–week period between December 2, 1979, and January 25, 1980, Ms. Goss worked 1.5 hours of overtime per week. Tr. 1–23. She was paid 2 hours of overtime during the fourth quarter of 1979. The overtime award made to Sharon Goss is the sum of $735.38.[19]

Randall Keith averaged 2.5 hours of overtime per week for the 31–week period between June 22, 1979, and January 25, 1980. Tr. 2–189. For the 12 weeks between June 22, 1979, and September 12, 1979, his weekly pay was $185, or $4.625 per hour. For the remaining 19 weeks, his pay per week was $200, or $5 per hour.

Mr. Keith was paid 14 hours of overtime for the third quarter of 1979 and 5 hours of overtime for the fourth quarter of that year. The overtime award here made to him is in the total sum of $425.82.[20]

Lila Locksley was also a *Monitor* reporter during the period between June 22, 1979, and January 25, 1980. She averaged 10 hours of overtime per week. Plaintiff's Exhibit 3–25; 127–28. For the 23 weeks between June 22, 1979, and December 3, 1979, her weekly pay was $180, or $4.50 per hour. For the remaining 8 weeks, her salary was $200 weekly, or $5 per hour.

Ms. Locksley was paid 20 hours of overtime in the third quarter of 1979 and 10.5 hours of overtime in the fourth quarter of that year. The overtime award here made to her is in the total sum of $1,942.50.[21]

Bradley Pokorny came to the *Monitor* in mid-August of 1979. He also averaged 10 hours of overtime per week. Tr. 3–170–71. For the 15 weeks between August 13, 1979, and November 26, 1979, Mr. Pokorny was paid $200 per week, or $5 per hour. For the remaining 8 weeks to January 25, 1980, his weekly salary was $210, or $5.25 per hour.

Mr. Pokorny was paid 8 hours of overtime in the third quarter of 1979 and 5 hours of overtime in the fourth quarter of that year. He is owed an award for overtime in the total sum of $1,656.38.[22]

During the period of damage entitlement, Eileen Pollack was employed for less than one week; that is, between January 21 and

19.

| | |
|---|---|
| 8 weeks × 4 hours = 32 hours × $6.9375 = | $222.00 |
| 20 weeks − 4 = 16 × 4 = 64 hours − 2 hours = 62 hours × $7.50 = | 465.00 |
| 4 weeks × 1.5 hours = 6 hours × $8.0625 = | 48.375 |
| Total | $735.38 |

20. The court allots 7 hours of the 14 hours of third-quarter overtime to the 12 weeks between June 22 and September 12, 1979. The remaining 7 hours of that quarter plus the 5 hours of the fourth quarter, or a total of 12 hours, are allotted to the 19–week period between September 12, 1979, and January 25, 1980.

| | |
|---|---|
| 12 weeks × 2.5 hours = 30 hours − 7 hours = 23 × $6.9375/hour = | $159.5625 |
| 19 weeks × 2.5 hours = 47.5 hours − 12 hours = 35.5 hours × $7.50 = | 266.25 |
| Total | $425.82 |

21. The court allots the 20 hours of the third quarter of 1979 plus 5 hours of the fourth quarter of that year to the 23–week period between June 22 and December 3, 1979. The remaining 5.5 hours of the fourth quarter are allotted to the 8–week period between December 3, 1979, and January 25, 1980.

| | |
|---|---|
| 23 weeks × 10 hours = 230 hours − 25 ≈ 205 × $6.75 = | $1,383.75 |
| 8 weeks × 10 hours = 80 − 5.5 = 74.5 hours × $7.50 = | 558.75 |
| Total | $1,942.50 |

22. The court allots the 8 hours of the third-quarter overtime and 2 of the fourth quarter hours to the 15–weeks period between August 13 and November 26, 1979. The balance of 3 hours for the fourth quarter is allotted to the 8–week period between November 26, 1979, and January 25, 1980.

| | |
|---|---|
| 15 weeks × 10 hours = 150 hours − 10 = 140 × $7.50 = | $1,050.00 |
| 8 weeks × 10 hours = 80 − 3 = 77 × $7.875 = | 606.375 |
| Total | $1,656.38 |

25, 1980. She averaged 10 hours of overtime per week. Tr. 3–67. Her weekly wage was $175, or $4.375 per hour.

Ms. Pollack received the sum of $13.13 in overtime pay. She is accordingly owed an award of $52.50.[23]

Rochelle Sharpe commenced her employment with the *Monitor* on November 28, 1979. She worked 20 hours of overtime per week. Plaintiff's Exhibit 5–19, 20. During the 11–week period of November 28, 1979, to January 25, 1980, her weekly pay was $175, or $4.375 per hour. The overtime due her is $1,443.75.[24]

Employed as a photographer, Thomas Sobolik averaged 10 hours of overtime per week. Plaintiff's Exhibit 2–17–19. For the 12 weeks between June 22, 1979, and September 12, 1979, his weekly wage was $185, or $4.625 dollars per hour. For the 19 weeks between September 12, 1979, and January 25, 1980, he was paid $205 per week, or $5.125 per hour.

Mr. Sobolik received 50 hours of overtime between April 7 and September 8, 1979, and 8 hours of overtime between September 15, 1979, and March 22, 1980. Plaintiff's Exhibit 8 for ID. The overtime owed him is the total sum of $2,088.94.[25]

Charles Stein worked 3 hours of overtime per week. Tr. 2–85. For the 4 weeks between June 22, 1979, and July 21, 1979, he was paid $225 weekly, or $5.625 per hour. Following a leave of absence, he returned to the *Monitor* for less than 1 week between January 21 and January 25, 1980. His week-ly salary was then $300, or $7 per hour. The overtime award made to Mr. Stein is the total sum of $126.45.[26]

Kenneth Williams, also a photographer, worked 5 hours of overtime per week prior to October of 1979. Defendants' Exhibit 96. For the single week between June 22 and June 30, 1979, his salary was $250 per week, or $6.25 per hour. For the 13 weeks between July 1, 1979, and October 1, 1979, he was paid $270 per week, or $6.75 per hour.

Mr. Williams was paid 5.5 hours of overtime in the third quarter of 1979 and 7.5 hours of overtime in the fourth quarter of 1979. He is owed the sum of $573.38 in overtime.[27]

Margaret Burton worked 2 hours of overtime per week. Tr. 6–14; 64. For the 10 weeks between June 22, 1979, and September 3, 1979, her weekly rate was $190, and her hourly rate was $4.75. For the 21 weeks between September 3, 1979, and January 25, 1980, her weekly pay was $205, and her hourly pay was $5.125.

Ms. Burton was paid 13 hours of overtime in the third quarter of 1979 and 43 hours of overtime in the fourth quarter of that year. Her overtime award is accordingly the sum of $49.88.[28]

The court found that the computation of the overtime for David Olinger was the most difficult of all such tasks. This is largely due to Mr. Olinger's practice of taking compensatory time in lieu of overtime. Defendants' Exhibit 103 at 148–165. The preponderance of the evidence, however, supports the find-

23.

  $10 \times \$6.5625 = \$65.625 - \$13.13 = \$52.50.$

24. $11 \times 20 = 220 \times \$6.5625 = \$1,443.75.$

25. The court has allotted 25 of the 50 hours to the 12–week period between June 22 and September 12, 1979, and has allotted 4 of the 8 hours to the 19–week period between September 12, 1979, and January 25, 1980.

| | |
|---|---|
| 12 weeks × 10 hours = 120 – 25 = 95 hours × $6.9375 = | $ 659.0625 |
| 19 weeks × 10 hours = 190 – 4 = 186 × $7.6875 = | 1,429.875 |
| Total | $2,088.94 |

26.

| | |
|---|---|
| 4 weeks × 3 hours = 12 × $8.4375 = | $101.25 |
| 1 week × 3 = 3 × $10.50 × .8 = | 25.20 |
| Total | $126.45 |

27.

| | |
|---|---|
| 1 × 5 = 5 × $9.375 = | $ 46.875 |
| 13 × 5 = 65 – 13 = 52 × $10.125 = | 526.50 |
| Total | $573.38 |

28. The 43 hours allotted to the fourth quarter exceed the 42 hours of overtime claimed by Ms. Burton. For the 10–week period between June 22 and September 3, 1979, the computation is as follows:

  10 weeks × 2 hours = 20 hours – 13 = 7 × $7.125 = $49.88

ing, here made, of 5 hours of overtime per week in the 31–week period between June 22, 1979, and January 25, 1980. During this period, Mr. Olinger was paid $250 per week, or $6.25 per hour.

Mr. Olinger received 23.5 hours of overtime in the third quarter of 1979 and 5 hours of overtime in the fourth quarter of that year. He is accordingly entitled to an award of $1,185.94 in overtime.[29]

### (2) Liquidated Damages

When violations of the overtime wage provisions of FLSA are found, the remedy includes payment of both unpaid wages and *mandatory* liquidated damages.

> Any employer who violates the provisions of ... section 207 ... *shall be liable* to the employee or employees affected in the amount of ... their unpaid overtime compensation ... and *in an additional equal* amount as liquidated damages.

29 U.S.C. § 216(b) (emphasis added).

The rationale for this statutory provision is that liquidated damages are compensatory *and not punitive in nature,* being provided to compensate employees for losses they might suffer by reason of not receiving their lawful wage at the time it was due. *Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896, 907 (3d Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992); *Overnight Motor Co. v. Missel,* 316 U.S. 572, 583–84, 62 S.Ct. 1216, 1222–23, 86 L.Ed. 1682 (1942).

Accordingly, there must be an award of liquidated damages unless "the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that [defendant] had reasonable grounds for believing that his act or omission was not a violation." 29 U.S.C. § 260. If such showing is made, an award of liquidated damages is discretionary.

The "plain and substantial" burden of proving entitlement to such discretionary relief rests upon the defendant employer. *Martin v. Cooper, supra,* 940 F.2d at 907. The "good faith" requirement is subjective

and requires proof that the employer had an honest intention to ascertain and follow the requirements of the statute. *Id.* The "reasonableness" requirement is an objective one, and ignorance alone does not serve to exonerate the employer. *Id.* at 907–08.

"To carry [its] burden, a defendant employer must show that [it] took affirmative steps to ascertain the [FLSA] requirements, but nonetheless, violated its provisions." *Id.* at 908. This burden is "difficult to meet," as double damages are the norm, single damages the exception. *Id.* (internal quotations and citations omitted).

At this juncture, it should be pointed out that (as is here the case) an employer's conduct may be found to be not willful, yet the employer may be unable to meet its statutory burden of good faith and reasonable grounds so as to avoid the imposition of liquidated damages. *Burgess v. Catawba County,* 805 F.Supp. 341, 351 (W.D.N.C. 1992); *Dalheim v. KDFW–TV,* 712 F.Supp. 533, 535 (N.D.Tex.1989). This is because the standards for determining the two issues are not identical. *Id.*

The record before the court with respect to the issue of liquidated damages does not permit the court to apply the discretionary limitation. The employer here knew, for example, that Mr. Olinger was taking compensatory time, not in the week he accrued overtime, but during a later period. Defendants' Exhibit 103 at 148–165. Several employees had been told to change their time cards when excessive overtime was reported. When employees failed to complete their time cards, co-employees, not necessarily knowledgeable of the actual hours involved, completed such time cards.

Such course of conduct fails to meet either the subjective honest intention to follow the dictates of FLSA or the objective standard of employer's conduct. *Martin v. Cooper, supra,* 940 F.2d at 907–08.

The court finds that liquidated damages in an amount equal to the overtime awards hereinabove made are to also be paid by the defendants herein.

---

**29.** 31 weeks × 5 hours = 155 hours − 28.5 = 126.5 hours × $9.375 = $1,185.94.

### (3) Interest

Since prejudgment interest serves the same purpose as an award of liquidated damages under FLSA, the employees are not here entitled to such interest. *Martin v. Cooper, supra,* 940 F.2d at 910–11.[30]

### (4) Injunction

The court finds and rules that the record presented by the plaintiff does not support any finding that there have been or will be continuing violations of FLSA by the defendants herein. Under these circumstances, the court finds that it should not and accordingly will not order injunctive relief as against the defendants.

### Conclusion

This case was well tried and hard fought. For the reasons hereinabove set forth, however, the court finds and rules that the employees of the defendants at times relevant to these proceedings were not exempt from the overtime requirements of FLSA as either "learned" or "artistic" professionals; that the defendants must pay overtime to those employees for whom awards of overtime are supported by the preponderance of the evidence herein adduced; and that equal sums of liquidated damages shall be awarded such employees. The court further finds and rules that neither interest nor injunctive relief is here warranted.

The statements hereinabove set forth shall comprise the findings of fact and rulings of law required by the mandatory provisions of Rule 52(a), Fed.R.Civ.P. Any requests for findings of fact or rulings of law which are not hereinabove impliedly granted are herewith denied.

SO ORDERED.

---

**30.** Plaintiff sought an award of either interest or liquidated damages, whichever could be found higher. If interest were to be here awarded, the court would accept the defendant's argument that it should not exceed six percent per annum. In such event, the award of liquidated damages would be the higher of the awards.