Robert B. REICH, Secretary of Labor,
U.S. Department of Labor,
Plaintiff–Appellant,

v.

NEWSPAPERS OF NEW ENGLAND, INC. D/B/A/ The Concord Monitor and George Wilson, Defendants–Appellees.

SECRETARY UNITED STATES DEPARTMENT OF LABOR,
Plaintiff–Appellee,

v.

NEWSPAPERS OF NEW ENGLAND, INC. D/B/A/ The Concord Monitor and George Wilson, Defendants–Appellants.

Nos. 94–1032, 94–1033.

United States Court of Appeals,
First Circuit.

Heard Sept. 16, 1994.

Decided Jan. 24, 1995.

Edward E. Shumaker III, with whom Robert J. Finn and Gallagher, Callahan & Gartrell, P.A., Concord, NH, were on brief, for Newspapers of New England, Inc. d/b/a Concord Monitor, et al.

John G. Kester, Thomas G. Hentoff and Williams & Connolly, Washington, DC, on brief, for Newspaper Ass'n of America, Nat. Newspaper Ass'n, American Soc. of Newspaper Editors, and Nat. Ass'n of Broadcasters, amici curiae.

Anne Payne Fugett, U.S. Dept. of Labor, with whom Thomas S. Williamson, Jr., Sol. of Labor, Monica Gallagher, Associate Sol., William J. Stone, Acting Deputy Associate Sol., and Albert Ross, Regional Sol., U.S. Dept. of Labor, Washington, DC, were on brief, for Secretary of Labor.

David S. Barr, Michael J. Gan and Barr, Peer & Camens, Washington, DC, on brief, for Newspaper Guild, AFL–CIO, CLC, amicus curiae.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and KEETON,* District Judge.

TORRUELLA, Chief Judge.

These cross appeals require us to decide whether the reporters, editors, and photographers employed by a small community newspaper are exempt from the overtime and recordkeeping provisions of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq. ("FLSA" or the "Act"). The case revolves around whether the employees at issue are exempt under the "professional employee" exemption of § 13(a)(1) of the Act.

This case arose when the United States Secretary of Labor ("the Secretary") brought this action against Newspapers of New England, Inc. d/b/a *The Concord Monitor* ("*The Monitor*"), and George Wilson, the newspaper's publisher, claiming that *The Monitor* had willfully violated the overtime and records requirements of the FLSA with respect to the wages it had paid its reporters, editors, and photographers. *The Monitor*'s primary defense was that the FLSA did not cover its actions because the employees at issue were exempt professionals. *The Monitor* also maintained that any FLSA violations it may have committed were not willful.

The case was tried to the bench. In an opinion issued seven years after the trial concluded, the court found that *The Monitor*'s newsroom employees were not entitled to the professional exemption from the Act's overtime requirements and awarded back wages and liquidated damages to twelve employees. The court also found, however, that the violations had not been committed willful-

ly and consequently limited the damages to the two-year period before the filing of the suit rather than the three-year period applicable to willful violations. The court refused to award damages for violations occurring after the close of the DOL's compliance investigation, and it denied the Secretary's request for a permanent injunction against future violations. These cross appeals followed.

Although the district court was inexplicably slow in issuing its less-than-meticulous opinion, we affirm for the reasons that follow.

## FACTUAL BACKGROUND

*The Monitor* is an award-winning small-city newspaper with a daily circulation in excess of 4,000 copies. It is published in Concord, New Hampshire, by the defendants, George Wilson and Newspapers of New England, Inc. In 1974, the Department of Labor ("DOL") investigated the newspaper under the FLSA and warned it of possible overtime and recordkeeping violations. Although the DOL did not press charges at that time, it informed the paper of the relevant FLSA requirements.

In late 1979 and early 1980, the DOL again investigated the pay practices in *The Monitor*'s newsroom. This investigation convinced the DOL that certain newsroom employees were not being paid for all their overtime hours. Consequently, the DOL commenced this litigation. The newsroom employees at issue in the Secretary's action were reporters, low-level editors, and photographers.

The evidence at trial consisted of the testimony, either live or through deposition, of fourteen newsroom employees and several experts in the field of journalism.

### 1. Newsroom Employees:

*The Monitor*'s editor-in-chief, Mike Pride, testified that he requires a college degree with an emphasis in writing to work as a staff writer or editor. Nevertheless, he conceded that a journalism degree was not a prerequisite for employment at *The Monitor*.

---

* Of the District of Massachusetts, sitting by designation.

In fact, Pride and at least one-half of the reporters who testified had degrees in subjects other than journalism.[1] For most of *The Monitor*'s reportorial staff, this employment was their first in the field of journalism.

### a. Staff Writers

When hired, *The Monitor*'s reporters were assigned to tasks ranging from writing features to covering legislative, municipal, and town governments and agencies. Some of their work was of a routine nature, such as compiling lists of the titles and times of local showings of motion pictures. The reporters testified that they worked essentially unsupervised, had authority and discretion over what they did and wrote, and decided how their assignments would be executed. Nevertheless, most of them testified that their time was spent on "general assignment" work and their writing was mainly focused on "hard news."

For example, staff writer Margaret Burton testified that during her first year, as an education reporter, she wrote about education issues and covered the State Department of Education as well as the meetings of the local school boards. When she was later assigned to cover court proceedings, she reported "who was charged, what the charges were and who the witnesses were and what they said."

Sharon Goss testified that she wrote "feature stories" when she first started at the paper. She described these stories as having "more of a fill the page kind of mentality . . . than go out and do something really creative." Ms. Goss testified that when she later became a regional reporter, she covered government and town planning meetings, visited offices of selectmen, called people on the phone about pertinent issues, and read through courthouse documents concerning lawsuits filed against towns.

Randall Keith testified that during his first year at *The Monitor* he spent approximately 90 percent of his time covering city hall and the remainder covering police and other general assignment stories. Later, he split his time between business writing and covering the police beat. He testified that none of his writing was highly complex and that it could have been done by anyone with general training and ability.

### b. Editors

Lila Locksley testified that her main duties were reading wire stories for grammatical and factual errors, writing headlines, and making improvements so that the stories were shorter or more readable. She also performed layout work. She testified that the layout work consisted of editing the stories, writing headlines, sizing photographs, and writing the captions that appeared beneath the photographs.

Nancy Druelinger offered similar testimony, stating that most of her time was spent writing headlines, reading over and rewriting wire stories, and laying out the pages. She also stated that it was her responsibility to decide which stories would appear in the paper. She testified that she thought her duties as an editor required imagination, creativity, and talent. She stated that decisions with regard to legal issues (such as whether a story was potentially libelous), taste, and newsworthiness were all within her discretion.

### c. Photographers

Photographer Tom Sobolik testified that 70 percent of his work was assigned and that he had no input as to which photos would be used in the newspaper. While Mr. Sobolik acknowledged that there are creative aspects to photojournalism, he stated that "a large proportion of it is pretty run-of-the-mill and pretty standardized."

Throughout the relevant period, Ken Williams spent most of his time shooting sports, exteriors and interiors of buildings, and politicians. Mr. Williams testified that more than 50 percent of his time was spent

---

1. Of the 32 employees for whom back wages were sought, six held Masters degrees, four of which were in journalism; 16 had earned Bachelor's degrees; one employee held an Associate degree; one had taken some college courses; and one had taken courses at an institute of photography.

in the developing of photos in the darkroom. In Mr. William's opinion, "there's very little news photography which is art" because "a news photographer tries to photograph reality, as it happens, without embellishment, without taking sides."

## 2. The Experts' Testimony

The Secretary offered the testimony of Ben H. Bagdikian, Dean of the Graduate School of Journalism at the University of California at Berkeley ("Dean Bagdikian"). In Dean Bagdikian's opinion, the majority of journalists do not meet the qualifications for professional exemption from the overtime provisions of the FLSA. He distinguished journalism from the traditional professions, such as law and medicine, in which there is an accumulated body of knowledge and a canon which every practitioner is required to know. He stated that there is no body of scholarly work which a journalist is required to know before he may practice. Rather, a journalist must be a skilled and accurate observer, have good judgment, and be able to write clearly.

Dean Bagdikian also testified that journalism is not a field in which the employee's work product depends primarily on invention, imagination, or talent. In his view, the vast majority of newspaper reporting centers around clear, disciplined observation of public events and people. He further testified that although there have been significant and substantial changes in the field of journalism, these changes do not warrant changing the definition of professional or changing the Secretary's position regarding employees in the field of journalism.

*The Monitor* offered the testimony of Robert Neale Copple, Dean of the College of Journalism at the University of Nebraska at Lincoln ("Dean Copple"). Dean Copple testified that the current field of journalism is vastly different than it was in the 1940's. He pointed out that nearly 90 percent of modern journalists have college degrees. In comparison, he estimated that only 30 percent of newsroom employees in the 1940's were college graduates. He further testified that, on the whole, the journalism done by the staff at *The Monitor* was creative and thought-provoking, requiring both imagination and talent.

## 3. *The Monitor*'s Overtime Policy

Coverage of legislative sessions and meetings of the city council often caused the reporters assigned to these events to work more than forty hours weekly. Although weekly timecards were collected for each newsroom employee, *The Monitor* discouraged overtime, and suggested that those who worked more than 40 hours should seek compensatory time in lieu of overtime. That is, they were supposed to work fewer hours on the other days of the week to reduce their total weekly hours to forty. At least three of the witnesses who testified had been told by their superiors to alter the time cards submitted to reduce the amount of overtime hours originally listed therein. Those employees also testified that they were occasionally reprimanded when they did report overtime and told to alter their weekly timecards so that no overtime hours would be included.

On other occasions, time cards for a given employee were completed by a co-employee, who necessarily did not have accurate information as to the actual hours worked by that employee. In light of these circumstances, many of the newsroom employees did not bother to prepare and file an accurate record of all hours, including overtime, worked weekly.

Employees did receive the compensation required by the FLSA for the overtime hours that they actually recorded on their weekly time cards. Mike Pride, *The Monitor*'s editor-in-chief, testified that it was *The Monitor*'s policy to pay overtime. He stated that overtime was to be authorized in advance, whenever possible, but that the overtime was always paid, whether authorized or unauthorized. Mr. Pride testified that this policy existed to control the cost of overtime.

## PROCEDURAL BACKGROUND

On June 22, 1981, the Secretary brought this action against *The Monitor,* and George Wilson, the newspaper's publisher. The complaint alleged that, since February 4,

1978, the newspaper had committed willful violations of the overtime and recordkeeping provisions of the FLSA, and that these violations were continuing. The Secretary sought a permanent injunction against the violations, and an award of back wages, along with interest and liquidated damages. Additionally, the Secretary claimed that three years of back pay were appropriate, rather than the normal two, because *The Monitor*'s FLSA violations had been willful under 29 U.S.C. § 255(a).

In its answer, *The Monitor* denied the Secretary's allegations and asserted as an affirmative defense that the employees were exempt from the applicable regulations of the Act, that any violation was the result of good faith reliance on the Department's "interpretations and/or past rulings," and that the claims were time barred.

The case was tried to the bench. With regard to the alleged FLSA violations at *The Monitor*, the Secretary presented the testimony of Department of Labor ("DOL") Compliance Officer Scott Wilkinson, and thirteen reporters, photographers, and editors employed by *The Monitor*. Throughout the trial, the Secretary denied *The Monitor*'s claim that its employees were exempt professionals. For over forty years the Secretary's position, set forth in non-binding departmental interpretations, had been that the majority of journalists are not exempt professionals under the FLSA. The Secretary stood behind this position and presented expert testimony in support of it at trial. The Secretary also attempted to present employee testimony concerning alleged FLSA violations occur-

ring at *The Monitor* after January 26, 1980, the last day covered by the DOL's investigation. *The Monitor* objected to this testimony, arguing that the Secretary could not enlarge its claims without amending its complaint. The district court allowed the proffered testimony but reserved a final ruling on the matter for its opinion.

In its defense, *The Monitor* primarily argued that the Secretary's forty-year-old journalism interpretations were obsolete and did not reflect the rigors and complexities of modern journalism. *The Monitor* moved the court to declare the interpretations null and void and hold that the majority of modern journalists qualify as exempt professionals under the FLSA. As a fallback position, *The Monitor* contended, albeit less vigorously, that its employees were exempt professionals regardless of whether the court overturned the Secretary's interpretations. *The Monitor* also maintained that any FLSA violations it may have committed were not willful.

■ Although the trial was completed in 1986, the district court did not issue its opinion and final judgment until November 3, 1993, 834 F.Supp. 530.[2] The court found that *The Monitor*'s newsroom employees were not entitled to the professional exemption of the Act's overtime requirements and awarded back wages and liquidated damages to twelve employees. However, the court found that the violations had not been committed willfully and consequently limited the damages to the two-year period before the filing of the suit rather than the three-year period

---

2. *The Monitor* contends that the seven year delay between the two-week trial and the decision constitutes reversible error. This type of delay, particularly in light of the sparse factual findings, concerns us. Not only does it affect the parties' rights to a speedy adjudication of their claims, it detracts from the public perception of the judicial system. Nevertheless, *The Monitor* has failed to enlighten us as to how the delay damaged the credibility of the district court's findings or otherwise prejudiced *The Monitor*. We are in agreement with the sentiments expressed by the Ninth Circuit while contemplating a similar delay:

> We are appalled by the delay, but we are aware of no case holding that a district court commits reversible error by taking too long to decide a case. Indeed, we doubt that appellate

review could ever be an effective means of enforcing district court timeliness.... To vacate and remand a decision which the district court has spent several years crafting hardly seems a sensible means to reduce delay. To reverse the decision on the ground of delay would require us to presume that lengthy deliberation inevitably leads to mistake.... Although we do not condone the long delay, we are not willing to assume without strong independent support that the district court departed from its proper role and considered only the evidence that was easiest to recall.

*Phonetele, Inc. v. American Tel. & Tel. Co.*, 889 F.2d 224, 232 (9th Cir.1989), *cert. denied,* — U.S. —, 112 S.Ct. 1283, 117 L.Ed.2d 508 (1992).

applicable to willful violations. The court refused to award damages for violations occurring after the close of the DOL's compliance investigation, and it denied the Secretary's request for a permanent injunction against future violations.

In finding that the employees were not exempt professionals, the court relied on the Secretary's journalism interpretations as persuasive authority. These interpretations state in pertinent part:

Newspaper writing of the exempt type must, therefore, be 'predominantly original and creative in character.' Only writing which is analytical, interpretative or highly individualized is considered to be creative in nature.... Newspaper writers commonly performing work which is original and creative within the meaning of § 541.3 are editorial writers, columnists, critics, and 'top-flight' writers of analytical and interpretative articles.

(2) The reporting of news, the rewriting of stories received from various sources, or the routine editorial work of a newspaper is not predominantly original and creative in character within the meaning of § 541.3 and must be considered as nonexempt work.

29 C.F.R. § 541.303(f) (1975).[3]

The district court rejected *The Monitor*'s contention that the interpretations should be declared invalid because of their age. Rather, the court accepted the interpretations as persuasive authority of how to apply the professional exemption in the field of journalism. Once credited as persuasive authority, the Secretary's interpretations all but decided the exemption issues. *The Monitor* presented little or no evidence suggesting that its employees performed "analytical, interpretative or highly individualized" work. Nor did *The Monitor* aver that its reporters were "editorial writers, columnists, critics, and 'top-flight' writers of analytical and interpretative articles." *The Monitor* made no significant attempt to differentiate the work of its reporters, photographers, and editors

from the work done at every newspaper throughout the country. *The Monitor*'s trial strategy hinged on its dogmatic attempt to debunk the Secretary's interpretations, and when this failed, its chances of prevailing on the exemption issues dwindled.

Following the entry of final judgment, both the Secretary and *The Monitor* filed timely notices of appeal. The Secretary appealed the district court's finding concerning willfulness, its refusal to issue an injunction, and its refusal to award damages for violations occurring after the close of the DOL's compliance investigation. *The Monitor* appealed the district court's decision that its employees were not exempt professionals. *The Monitor*'s appeal reiterates its trial strategy and rests primarily on the contention that the Secretary's journalism interpretations have been rendered obsolete by the technological and societal changes of the last forty years. The Newspaper Guild AFL–CIO filed an amicus brief in support of the Secretary while the Newspaper Association of America filed a brief supporting *The Monitor*.

## STANDARD OF REVIEW

■ Appeals involving pure questions of law are generally reviewed *de novo*. *In re Extradition of Howard*, 996 F.2d 1320, 1327 (1st Cir.1993) (citation omitted). In contrast, appeals involving straight factual determinations require us to accept the trier's resolution unless shown to be clearly erroneous. *Id.* (citation omitted).

■ The case before us presents several issues containing mixed questions of fact and law. As we have previously noted, these issues require a somewhat nuanced standard of review. *See id.* "[A]ppeals in the federal court system are usually arrayed along a degree-of-deference continuum, stretching from plenary review at one pole to highly deferential modes of review (*e.g.*, clear error, abuse of discretion) at the opposite pole." *Id.* The standard of review we apply to

**3.** On October 9, 1992, the interpretive regulations, 29 C.F.R. § 541.301, 541.302 and 541.303, were redesignated, without change, as 29 C.F.R. § 541.300, 541.301 and 541.302, respectively. 57 Fed.Reg. 46744 (1992). We refer to the earlier codification because it is used throughout the parties' briefs and the district court opinion.

mixed questions usually depends on "where they fall along the degree-of-deference continuum: the more fact dominated the question, the more likely it is that the trier's resolution of it will be accepted unless shown to be clearly erroneous." *Id.* at 1328.

## DISCUSSION

## I. The FLSA Exemptions

### A. *The Statutory Framework*

■ The overtime provisions of the FLSA establish the general rule that employees must be compensated at a rate not less than one and one-half times their regular rate for all overtime hours. 29 U.S.C. § 207(a)(1). Overtime is defined as any employment in excess of 40 hours in a single workweek. *Id.* However, these overtime compensation provisions do not apply to "any employees employed in a bona fide executive, administrative, or professional capacity ... (as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor] ...)." 29 U.S.C. § 213(a)(1). The employer in an FLSA case bears the burden of establishing that its employees are exempt, and because of the remedial nature of the FLSA, exemptions are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960); *Secretary of Labor v. DeSisto*, 929 F.2d 789, 797 (1st Cir.1991) (citations omitted).

■■ The specific requirements of the professional exemption are not set forth in the statute. Rather, they are articulated in the regulations and interpretations of the Secretary. The Secretary's regulations are promulgated pursuant to an express delegation of legislative authority and must be given controlling weight unless they are found to be arbitrary, capricious, or contrary to the statute. *See Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Unlike the regulations, however, the Secretary's interpretations are not conclusive, even in the cases with which they directly deal. *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). Rather, they merely set forth the official position of the DOL on how the regulations should be applied in specific contexts. Nevertheless, the courts may refer to the interpretations for guidance. *See id.*

The relevant legal guidelines for determining whether an employee is an exempt professional are described in the Secretary's regulation 29 C.F.R. § 541.3. The relevant interpretations are set forth at 29 C.F.R. §§ 541.301, 541.302 and 541.303. The regulation enumerates several types of professional exemptions, two of which are relevant here: the so-called "learned professional" and "artistic professional" exemptions.

### 1. The Learned Professional Exemption

■ The learned professional exemption deals with occupations which have specific educational requirements, including law, accounting, engineering, architecture, nursing, and medicine. *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 698 n. 15 (3d Cir.1994). The regulation states that this exemption applies to employees whose "primary duty" consists of "[w]ork requiring knowledge of an advance [sic] type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education...." 29 C.F.R. § 541.3(a)(1).

The interpretations state that "[t]he word 'customarily' implies that in the vast majority of cases the specific academic training is a prerequisite for entrance into the profession." 29 C.F.R. § 541.302(d). Moreover, "[t]he typical symbol of the professional training and the best prima facie evidence of its possession is, of course, the appropriate academic degree, and in these professions an advanced academic degree is a standard (if not universal) prerequisite." 29 C.F.R. § 541.302(e)(1). The interpretations specifically declare that the exemption does not encompass "such quasi-professions as journalism in which the bulk of the employees have acquired their skill by experience rather than by any formal specialized training." 29 C.F.R. § 541.302(d). Further, "[n]ewspaper

writers, with possible rare exceptions in certain highly technical fields, do not meet the requirements of § 541.3(a)(1) for exemption as professional employees of the 'learned' type." 29 C.F.R. § 541.303(f)(1).

## 2. The Artistic Professional Exemption

The artistic exemption applies to professionals working in a "recognized field of artistic endeavor." 29 C.F.R. § 541.3. Exempt artistic professionals may be found in many fields, including music, writing, the theater, and the plastic and graphic arts.

The regulation outlines both a short and long test for determining whether an employee qualifies as an artistic professional. The long test is applied to employees who earn weekly salaries of at least $170 but less than $250. The short test is used for employees whose weekly salary is not less than $250.[4] Both tests demand that the employee's "primary duty" consist of work requiring "invention, imagination, or talent...." 29 C.F.R. § 541.3. The long test also requires that the employee's primary duty consist of "[w]ork that is original and creative in character...." 29 C.F.R. § 541.3(a)(2).

The interpretations state that "[o]nly writing which is analytical, interpretive or highly individualized is considered to be creative in nature.... Newspaper writers commonly performing work which is original and creative within the meaning of § 541.3 are editorial writers, columnists, critics, and 'top-flight' writers of analytical and interpretive articles." 29 C.F.R. § 541.303(f)(1). With regard to the "invention, imagination, or talent" requirement, the Secretary's interpretation says:

> In the case of newspaper employees, the distinction here is similar to the distinction observed ... in connection with the requirement that the work be "original and creative in character." Obviously the majority of reporters do work which depends

primarily on intelligence, diligence, and accuracy. It is the minority whose work depends primarily on "invention, imagination, or talent." 29 C.F.R. § 541.303(d).

## B. *The Authority of the Journalism Interpretations*

The Secretary's journalism interpretations have not changed in any material respect since 1949, long before the newspaper industry evolved into its current form. The parties vigorously dispute what weight, if any, courts should give these interpretations when they apply the regulation. *The Monitor* asks us to declare that the interpretations are obsolete and invalid because they do not reflect the complexities and rigors of modern journalism. The Secretary contends that the interpretations are still highly relevant because the technological and societal changes of the last forty years have not altered the day-to-day duties of the majority of reporters.

This is the central issue on appeal. Once the district court accepted them as persuasive authority, the Secretary's interpretations were nearly conclusive on the exemption issues. *The Monitor* made a less extensive effort to prove that its employees performed "analytical, interpretative or highly individualized" work. *The Monitor* made no significant attempt to differentiate the work of its reporters, photographers, and editors from the work done at every newspaper throughout the country. Therefore, in light of *The Monitor*'s trial strategy, if we decline to invalidate the journalism interpretations, the record will almost certainly compel us to affirm the district court's decision on the exemption issues.

■ As we noted above, although the Secretary's interpretations are not *controlling*, courts may refer to them for guidance. *Skidmore v. Swift & Co.*, 323 U.S. at 139–40, 65 S.Ct. at 164. In making a similar determination,[5] the Supreme Court noted:

---

**4.** As the Third Circuit noted, "[t]he short test was added to the FLSA in 1949 in large part because the DOL felt that salary level turned out to be a good proxy for determination of professional status." *Gateway Press, Inc.*, 13 F.3d at 698 n. 16. That is, in the DOL's judgment, higher salaried employees are more likely to meet all the requirements of the exemption. *Id.*

**5.** In *Skidmore,* the Supreme Court was evaluating the persuasive weight of the opinions, interpretations, and rulings of the Wage and Hour Administrator under the FLSA.

[w]e consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Skidmore,* 323 U.S. at 140, 65 S.Ct. at 164. *The Monitor* contends that the district court misapplied *Skidmore.* Specifically, *The Monitor* asserts that any reliance on the Secretary's interpretations was erroneous because they are "outdated, inconsistent with other agency pronouncements, and contain vague and undefined terms." [6]

As a preliminary matter, we discuss the standard of review appropriate for appellate scrutiny of a district court's *Skidmore* analysis.[7] Although we have not previously addressed this issue, the Fifth Circuit provides meaningful guidance. In *Dalheim v. KDFW–TV,* a television station charged with violating the FLSA's overtime provisions made essentially the same argument asserted by *The Monitor:* that "the district court gave the interpretations undue weight, thus blinding itself to the realities of modern broadcast journalism." 918 F.2d 1220, 1228 (5th Cir.1990). The Fifth Circuit reasoned that a district court's *Skidmore* analysis is merely a fact-specific inquiry to determine whether the interpretation reflects an analogy useful in deciding the case before it. *Id.* Thus, any "attempt to debunk the analogy between the interpretation's portrayal of broadcasting and journalism as they existed in the 1940's and broadcast journalism as it exists today is a veiled attack on the district court's findings of fact." *Id.* Consequently, because a district court's *Skidmore* analysis is fact-based, we review it subject to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a).

Both the Secretary and *The Monitor* presented extensive expert testimony as to whether the technological and societal changes of the past forty years have rendered the Secretary's journalism interpretations obsolete. The Secretary presented the testimony of Ben Bagdikian, Dean of the Graduate School of Journalism at the University of California at Berkeley. Mr. Bagdikian testified that although the field of journalism has changed radically, these changes do not warrant modifying the Secretary's view that most journalists do not qualify as exempt professionals under the FLSA. In his

---

6. We are unpersuaded by *The Monitor*'s contention that the Secretary's interpretations should have been disregarded because they are inconsistent with other agency pronouncements and internally inconsistent.

There is no rule of law requiring an administrative agency to give a term the same definition in all contexts. "When construing the FLSA and its exemptions, courts should look primarily to the purpose of the act itself—and not interpretations of the same or a similar term made in other contexts." *Reich v. Gateway Press, Inc.,* 13 F.3d at 699 n. 17. With regard to the assertion that the interpretations are internally inconsistent, we follow the reasoning of the Third Circuit:

"We also reject the amicus' characterization of the interpretations as being 'self-contradictory' because they state that 'many' reporters are exempt while 'many' are not. The interpretations merely recognize that the determination of whether a reporter is a professional does not depend on the title that a paper gives a reporter. Rather, it instead depends upon the specific characteristics of a given reporter's job."

*Id.*

7. There are, in fact, two inquiries that must be made when a court is determining what weight should be given to an administrative interpretation. First, a court will declare an interpretation invalid if it is found to be arbitrary, capricious, or contrary to the statute. *See Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 158, 111 S.Ct. 1171, 1180, 113 L.Ed.2d 117 (1991) (holding that the "Secretary's interpretation of an ambiguous regulation is subject to the same standard of substantive review as any other exercise of delegated lawmaking power."); *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Second, the court applies the *Skidmore* analysis to determine the level of deference it should accord a valid administrative interpretation. Here, we are only concerned with the second inquiry because neither party contends that the Secretary's interpretations are invalid under the first.

view, the focus of the majority of journalists is the same today as it was forty years ago: to report disciplined observations of public people and public events. This testimony essentially ends appellate review of the matter. It was neither severely impeached nor inherently implausible, and "[o]nce credited, it supported the district court's rationale almost singlehandedly." *Rivera–Gómez v. de Castro,* 900 F.2d 1, 4 (1st Cir.1990). Although *The Monitor* presented conflicting testimony, the district court's decision to accept the interpretations as persuasive authority cannot be said to be clearly erroneous.[8]

### C. The Professional Exemptions

■■ Whether *The Monitor*'s employees are within the scope of the FLSA professional exemption is a mixed question of fact and law. *Gateway Press, Inc.,* 13 F.3d at .691. In reviewing this issue, we elect to follow the Fifth Circuit's approach, in which the appellate court separates out the questions of fact from the ultimate legal conclusion and applies a clearly erroneous standard to the former while exercising plenary review over the latter. *Dalheim,* 918 F.2d at 1226.

■■■ As the Fifth Circuit noted, there are three distinct types of findings involved in determining whether an employee is exempt. *Id.* First, the district court makes findings of historical fact, regarding, for example, the day-to-day duties of the employees. *Id.* These are reviewed under the "clearly erroneous" standard of Federal Rule of Civil Procedure 52(a). *Id.; see also Icicle Seafoods v. Worthington,* 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986); *Donovan v. Burger King Corp.,* 672 F.2d 221, 227 (1st Cir.1982). Second, to apply the Sec-

retary's regulations, the district court must draw conclusions from the historical facts. *Dalheim,* 918 F.2d at 1226. For example, whether an employee's work requires "invention, imagination, or talent" and whether such work constitutes an employee's "primary duty" are conclusions drawn from historical facts. *Id.* Such inferences are also subject to the clearly erroneous standard of review. *Id.* Lastly, the district court makes the ultimate legal conclusion of whether an employee is exempt. Although this is based on both historical facts and factual inferences, it is a conclusion of law, over which we. exercise plenary review. *Id.; see also Icicle Seafoods,* 475 U.S. at 714, 106 S.Ct. at 1530; *Gateway Press, Inc.,* 13 F.3d at 691.

Although the determination of whether an employee is exempt is clearly tied to the district court's factfinding, we are acutely aware of our duty to canvas the record thoroughly. Further, we review the district court's decision to ensure that its factfinding was guided by the proper legal standards. "[T]o the extent that findings of fact can be shown to have been predicated upon, or induced by, errors of law, they will be accorded diminished respect on appeal." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 972 F.2d 453, 457 (1st Cir.1992).

### 1. Artistic Professional Exemption

As we discussed above, 29 C.F.R. § 541.3 outlines both a short and long test for determining whether an employee qualifies as an artistic professional. The long test is applied to employees who earn weekly salaries of at least $170 but less than $250. The short test

---

8. *The Monitor* also contends that the district court mistakenly confused a Wage and Hour Administrator's interpretation, 29 C.F.R. § 541.303, with the Secretary of Labor's regulation, 29 C.F.R. § 541.3, and thus applied incorrect legal standards in determining that *The Monitor*'s employees were not exempt from the overtime provisions of the FLSA. We find this contention completely without merit. As we noted above, the district court's *Skidmore* analysis and subsequent reliance on the Secretary's interpretations were not in error. Our review of the record and the district court's opinion indicates that it was well aware of the distinction between the regulations and interpretations. Indeed, the

district court's opinion quotes from *Skidmore* immediately prior to its refusal to disregard the Secretary's interpretations. *Reich v. Newspapers of New England, Inc.,* 834 F.Supp. 530, 535 (1993). The only evidence supporting *The Monitor*'s contention is the fact that the district court's opinion incorrectly refers to the interpretations as regulations. *See, e.g., id.* at 534–35. These misstatements, considered in light of the record and the district court's *Skidmore* analysis, do not indicate that the district court confused the interpretations and regulations. Rather, this is more likely a matter of miscitation than an indication of a basic misunderstanding.

is used for employees whose weekly salary is not less than $250.

Although the long test has many requirements,[9] the most significant for our analysis are that (1) the employee's primary duty consist of "[w]ork that is original and creative in character in a recognized field of artistic endeavor" and (2) "the result of which depends primarily on the invention, imagination, or talent of the employee...." 29 C.F.R. § 541.3(a)(2); *see Gateway Press, Inc.*, 13 F.3d at 698.

The short test for determining whether an employee is exempt as an artistic professional is more simple. It requires only that the employee's primary duty consist of "work requiring invention, imagination, or talent in a recognized field of artistic endeavor...." 29 C.F.R. § 541.3(e); *see Gateway Press, Inc.*, 13 F.3d at 698. The short test does not include the requirements of 29 C.F.R. § 541.3(b), (c) and (d) and does not require that the work be "original and creative in character." As the Third Circuit noted, "[w]hile the tests are not all that different, it seems clear that any employee who is not a professional under the short test will not be one under the long test." *Gateway Press, Inc.*, 13 F.3d at 698.

### a. Short Test Employees

 *The Monitor* maintains that the district court erroneously applied the long test for artistic professionals to three reporters— David Olinger, Charles Stein, and Paul Carrier—whose weekly salary qualified them for analysis under the short test. *The Monitor* contends that the district court incorrectly required that the newspaper writing of these

employees be " 'predominantly original and creative in character' " when the correct standard merely required that the employee's "primary duty" consist of "work requiring invention, imagination, or talent in a recognized field of artistic endeavor." *Reich v. Newspapers of New England, Inc.*, 834 F.Supp. 530, 537 (D.N.H.1993). *The Monitor* claims that this was reversible error because the district court erroneously required these employees to meet a much more difficult standard.

The district court's opinion suggests that it did not specifically apply the short test to those employees of *The Monitor* with weekly salaries above $250. However, as we discuss below, our review of the record against the backdrop of the Secretary's interpretations leads us to conclude that these three employees do not qualify as exempt artistic professionals, even under the short test. Therefore, even if the district court erroneously applied the "original and creative in character" requirement of the long test, this error was harmless.

The relevant portion of the short test requires us to determine (1) the employee's "primary duty," and (2) whether the performance of that duty requires "invention, imagination, or talent." Because the Secretary stipulated that writing was the primary duty of these employees, the only issue remaining is whether their writing required "invention, imagination, or talent."

With regard to the "invention, imagination, or talent" requirement, the Secretary's interpretation says:

> (c) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; and
> (d) Who does not devote more than 20 percent of his hours worked in the workweek to activities which are not an essential part of and necessarily incident to the work described in paragraphs (a) through (c) of this section....
> 29 C.F.R. § 541.3 (1975).

---

9. The long test exempts as an artistic professional any employee:
 (a) Whose primary duty consists of the performance of:

 . . . . .

 Work that is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee; and
 (b) Whose work requires the consistent exercise of discretion and judgment in its performance; and

In the case of newspaper employees, the distinction here is similar to the distinction observed ... in connection with the requirement that the work be "original and creative in character." Obviously the majority of reporters do work which depends primarily on intelligence, diligence, and accuracy. It is the minority whose work depends primarily on "invention, imagination, or talent."

29 C.F.R. § 541.303.[10] The district court found, and we agree, that *The Monitor* employees did not fulfill this requirement.

The record demonstrates that the day-to-day duties of these three reporters consisted primarily of "general assignment" work. Among other things, their stories covered public utility commission hearings; criminal and police activity; city and state legislative proceedings; business events, including compiling a list of people who had been promoted; and local art events. Rarely were they asked to editorialize about or interpret the events they covered. Rather, the focus of their writing was, as David Olinger phrased it, "to tell someone who wanted to know what happened ... in a quick and informative and understandable way." Thus, we believe that these reporters were like the majority of reporters in that their work "depends primarily on intelligence, diligence, and accuracy." 29 C.F.R. § 541.303. They were not performing duties which would place them in that minority of reporters "whose work depends primarily on 'invention, imaging [sic], or talent.'" *Id.* Although some of the work product of these employees demonstrated creativity, invention, imagination, and talent,

their writing did not exhibit these qualities on a day-to-day basis.[11]

■ Of course, our decision should not be read to mean that all journalism work is nonexempt. The field of newspaper writing is certainly a medium capable of sustaining creativity. We want to reiterate that whether an employee is an exempt professional is independent of the title the employer ascribes to the position. As the interpretations point out, "[t]he field of journalism ... employs many exempt as well as many nonexempt employees under the same or similar job titles." 29 C.F.R. § 303(f). The determination of whether the exemption applies to a given employee depends on the specific duties and characteristics required by the position rather than its actual title. However, "if we were to find that [these] reporters are in the minority of reporters whose work requires invention, imagination, or talent, it is hard to see what reporters would be left in the majority." *Gateway Press, Inc.,* 13 F.3d at 700; *cf. Sherwood v. The Washington Post,* 677 F.Supp. 9, 11 (D.D.C.1988), *rev'd,* 871 F.2d 1144 (D.C.Cir.1989) (The court found that 13 writers for *The Washington Post* qualified as exempt artistic professionals because their writing was individual, interpretive, and analytical; because success at *The Post* requires a "special talent"; and because they "produce original and creative writing of high quality within the meaning of the regulations...." Although this case was reversed because factual disputes rendered disposition on summary judgment inappropriate, it serves to highlight the distinction between exempt and non-exempt newspaper work.).[12]

---

10. We follow the reasoning of the Third Circuit's *Gateway Press, Inc.* opinion and reject the argument that the interpretations only apply to the long test:

"Although this interpretation of the phrase 'invention, imagination, or talent' seems to refer to the phrase as it is used in [the long test] rather than as it is used in [the short test], there is nothing to suggest that such a phrase has a different meaning in the two different parts of the regulations. Indeed, as a matter of statutory construction, where one word is used in one place, it should have the same meaning in another place in the same statute ... There is no reason to think that this principle should not equally apply to regula-

tions." *Reich v. Gateway Press, Inc.,* 13 F.3d at 700 n. 18 (citations omitted).

11. The issue of whether an employee is an exempt professional forces the opposing parties into paradoxical positions: The management argues that the employee's work is distinct and creative, and thus does not merit overtime pay; the worker maintains that he deserves overtime pay because his work is routine and non-specialized. Both parties are compelled to make arguments contrary to their customary economic bargaining positions.

12. The district court recently concluded trial and released its opinion in *Sherwood,* holding that Sherwood was an exempt employee because his

### b. Long Test Employees

*The Monitor* also contends that the district court misapplied the long test, and consequently, erroneously determined that the remainder of *The Monitor* employees at issue in this case were not exempt professionals. Specifically, *The Monitor* contends that the record demonstrates that the staff writers, photographers, and editors at *The Monitor* qualify as exempt artistic professionals under a correct application of the regulation. We disagree.

As we noted above, the district court's reliance on the Secretary's interpretations was not erroneous. Therefore, because we find that the district court conducted its analysis within the correct legal framework, we review its factfinding for clear error.

### i. Staff Writers:

■ With regard to the staff writers salaried below $250 per week, their day-to-day responsibilities were very similar to those of the staff writers discussed above. For example, staff writer Margaret Burton testified that three fourths of her stories covered hard news, such as the proceedings of the school board, educational issues, trials and court hearings, as well as the legislative hearings. She estimated that only one fourth of her writing constituted feature writing requiring in-depth interpretation or analysis.

Staff writer Sharon Goss testified that during her first year at the paper, she spent approximately sixty percent of her time writing what she called feature stories. The topics of these stories were usually assigned by an editor, and rarely demanded the imagination, interpretation, or invention that characterizes exempt newspaper writing.[13] The remaining forty percent was divided between "deadline work" and clerical tasks, such as compiling local movie listings. During the latter portion of her tenure at *The Monitor*, as an educational reporter and a regional reporter, she covered educational issues and government and town planning meetings.

Staff writer Randall Keith testified that the vast bulk of his first year at *The Monitor* was spent working the city hall beat. His second year was divided between covering the police beat and business writing. His third year was spent as a regional reporter, covering town meetings and activities. Overall, he described his day to day duties as being primarily the type of general assignment work which could be accomplished by anyone with general intellectual training and ability.

As these examples make clear, the employees salaried below $250 had substantially the same responsibilities as those reporters, discussed above, with salaries above $250. Consequently, we find that the record contains ample support for the district court's conclusion that these reporters were not performing the type of work that would qualify them for the artistic professional exemption. Rather, like their higher-salaried counterparts, they were like the majority of reporters in that their work "depends primarily on intelligence, diligence, and accuracy." They were not performing duties which would place them in that minority of reporters "whose work depends primarily on 'invention, imaging [sic], or talent.'"

### ii. Photographers:

■ We also find ample support in the record for the district court's conclusion that the photographers at *The Monitor* were not performing exempt work. Staff photographer Tom Sobolik testified that most of his film was shot at sporting events. He also listened to the police radio and photographed any newsworthy events it reported, including

---

reporting job at *The Washington Post* required invention, imagination, and talent. *Sherwood v. The Washington Post*, 677 F.Supp. 9. Without passing on the merits of this decision, we note that it is distinguishable on its facts from the present case. Most notably, the *Sherwood* court distinguished the work of reporters at *The Washington Post* from the type of small town reporting addressed by the Third Circuit in *Gateway Press, Inc.*. Thus, the district court's second opinion in *Sherwood* again highlights the distinction between exempt and non-exempt work in the field of journalism.

13. For instance, one story reported on the local attitude toward the rising price of hamburgers. Another story, on a local man who had just opened an art store, centered on his business, his goods, and whether he thought it would succeed.

auto accidents and fires. Approximately seventy percent of Tom Sobolik's photography was assigned. Further, he testified that although there are some creative aspects to his photography, "a large proportion of it is pretty run of the mill and pretty standardized."

Ken Williams testified that he spent most of his picture-shooting time photographing sporting events, the pet of the week, interiors and exteriors of buildings, press meetings, and meetings with the Governor. He also spent a large amount of time in the darkroom developing the pictures he and the other photographers had shot. He conceded that the darkroom work and the majority of his photography did not, in his mind, constitute artistic work.

The testimony of these photographers indicates that they, like the staff writers, were not performing the type of photographic work which would qualify them under the artistic exemption.[14]

### iii. Editors:

■ *The Monitor* asserts that the district court erroneously ruled that three editors were not exempt artistic professionals under the long test despite the Secretary's concession that they were exempt under the short test. Because this contention has absolutely no basis in the record, we reject it.

Admittedly, the Secretary concluded that the three editors at issue—Sharon Goss, Nancy Druelinger, and Lila Locksley—qualified for exemption once their salaries rose above $250. Having so concluded, however, the Secretary did not pursue, and the court

did not award, back wages for the period during which these employees were paid over $250 per week. Rather, the court concluded that before their weekly salaries rose above $250, these editors were not performing work that qualified them for exemption under the long test for artistic professionals,[15] which requires that their primary duty consist of "[w]ork that is original and creative in character" and "which depends primarily on the invention, imagination, or talent of the employee...." 29 C.F.R. § 541.3(a)(2).

We find this conclusion to have ample support in the record. Ms. Locksley testified that her main duties were reading wire stories for grammatical and factual errors, writing headlines, and making improvements so that the stories were shorter or more readable. Ms. Druelinger offered similar testimony, stating that most of her time was spent writing headlines, reading over and rewriting wire stories, and laying out the pages.[16] Ms. Goss's testimony was comparable. Overall, their day-to-day work was the type of routine editorial work that is generally considered nonexempt. *See* 29 C.F.R. § 541.303(f) (The reporting of news, the rewriting of stories received from various sources, or the routine editorial work of a newspaper is not predominantly original and creative in character within the meaning of § 541.3 and must be considered as nonexempt work.).

### 2. The Learned Professional Exemption

■ The district court also held that *The Monitor*'s journalists did not qualify under the learned professional exemption of 29

14. *The Monitor* contends that the district court erroneously applied the long test to Ken Williams, whose weekly salary was above $250. The opinion does not conclusively indicate what test was applied to Ken Williams. Nevertheless, we find that the error, if indeed there was one, was harmless. The work performed by Mr. Williams did not require "invention, imagination, or talent," and thus is not exempt, even under the short test.

15. *The Monitor*'s brief suggests that there is an inconsistency between the Secretary's decision not to pursue back wages for editors paid over $250 per week and the district court's decision that the lower paid editors were not exempt under the long test for artistic professionals. Once again, *The Monitor* is wrong. The Secre-

tary determined that the higher paid editors were exempt under the executive exemption 29 C.F.R. § 541.1—not the short test for artistic professionals.

16. Admittedly, layout and page design can qualify under the artistic professional exemption. In fact, the Secretary concluded that Tom Chants, an editor at *The Monitor*, was an exempt artistic professional. However, as Druelinger testified, Chants's work was considerably different from the work that she, Ms. Locksley, and Ms. Goss performed: "Tom Chants, he did the beautiful art work pages. He was able to take lots of time and did not do the breaking news. He did the beautiful features, layouts and fill. He had a lot more time to do his pages."

C.F.R. § 541.3. In a footnote to its brief, *The Monitor* joins its amici supporters in contending that this determination was error.

Exempted learned professions include law, accounting, engineering, architecture, nursing, and medicine. 29 C.F.R. § 541.302. *The Monitor* would have us add journalism to this list, arguing that most of its employees had either journalism degrees or liberal arts degrees with an emphasis on writing.

The learned professional exemption applies to employees whose "primary duty" consists of "[w]ork requiring knowledge of an advance [sic] type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education...." 29 C.F.R. § 541.3(a)(1). As the interpretations make clear, "[t]he word 'customarily' implies that in the vast majority of cases the specific academic training is a prerequisite for entrance into the profession." 29 C.F.R. § 541.302(d). Further, "[t]he typical symbol of the professional training and the best prima facie evidence of its possession is, of course, the appropriate academic degree, and in these professions an advanced academic degree is a standard (if not universal) prerequisite." 29 C.F.R. § 541.302(e)(1). The interpretations specifically state that the exemption does not encompass "such quasi-professions as journalism in which the bulk of the employees have acquired their skill by experience rather than by any formal specialized training." 29 C.F.R. § 541.302(d).

While we acknowledge that these interpretations are not controlling, we join the substantial number of courts that have chosen to follow them on this issue. *See, e.g., Gateway Press, Inc.*, 13 F.3d at 698 (holding that the "case law has held that reporters do not come within the scope of the learned exemption"); *Sun Publishing Co. v. Walling*, 140 F.2d 445 (6th Cir.), *cert. denied*, 322 U.S. 728, 64 S.Ct. 946, 88 L.Ed. 1564 (1944) (rejecting the contention that writers and reporters are learned professionals); *Dalheim v. KDFW–TV*, 706 F.Supp. 493, 501–02 (N.D.Tex.1988) (holding that despite the fact that many broadcast journalists hold undergraduate degrees and adhere to an established code of

ethics, they are not learned professionals because, *inter alia,* their training is more akin to an apprenticeship than to intellectual instruction and study), *aff'd,* 918 F.2d 1220, 1226 (5th Cir.1990); *Freeman v. National Broadcasting Co., Inc.*, 846 F.Supp. 1109, 1154–55 (S.D.N.Y.1993) (In holding that the broadcast journalists were not exempt learned professionals, the court noted that journalism interpretations remain persuasive despite their age because, *inter alia,* "experience and on-the-job training still play a substantial role in the training of journalists...").

In upholding the district court's finding that the journalists at *The Monitor* do not qualify under the learned professional exemption, we note that many experts in the field believe that journalism can only be learned in the newsroom itself. No particular academic degree is a prerequisite for entrance into the field and applicants are not required to demonstrate mastery over a specific body of knowledge. Rather, as Dean Bagdikian from the Graduate School of Journalism at the University of California at Berkeley testified, editors hiring entry-level journalists are mainly concerned with whether the applicant's writing samples demonstrate accuracy, intelligence, and an ability to write clearly. Applicants possessing these qualities are the most likely to absorb the on-the-job training and become successful journalists. The importance of actual newspaper experience as opposed to journalism courses is demonstrated by the fact that top-flight newspapers generally hire only experienced applicants with demonstrable journalism skills. *See Sherwood*, 677 F.Supp. at 11. In light of these considerations, we agree with the district court's determination that the journalists at *The Monitor* are not exempt learned professionals.

### 3. *Rule 52(a) Findings of Fact*

*The Monitor* asserts that we must vacate the judgment and remand the case to the district court for its alleged failure to make the findings of fact required by Federal Rule of Civil Procedure 52(a). Rule 52(a) requires that "[i]n all actions tried upon the facts without a jury ... the court shall

find the facts specially and state separately its conclusions of law thereon...." .Fed. R.Civ.P. 52(a). We have previously noted, however, that the purpose of the rule is to apprise the appellate court of the grounds on which the trial court based its decision. *Applewood Landscape & Nursery Co., Inc. v. Hollingsworth,* 884 F.2d 1502, 1503 (1st Cir. 1989) (citation omitted). Therefore, findings are sufficient so long as they "indicate the factual basis for the ultimate conclusion." *Kelley v. Everglades Drainage District,* 319 U.S. 415, 422, 63 S.Ct. 1141, 1145, 87 L.Ed. 1485 (1943). The "judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts.'" *Applewood Landscape,* 884 F.2d at 1503 (quoting Fed. R.Civ.P. 52(a), advisory committee's note to 1946 Amendment). "As long as such 'brief' and 'pertinent' findings are made and 'the record as a whole supports the district court's findings of fact,' we can affirm its result." *Id.* at 1503 (citations omitted). Further, even where the district court's findings were poorly done because they consisted "mainly of mere conclusions ... and [did] not articulate specific factual bases for the trial court's boilerplate decision," there was no Rule 52(a) defect because "despite the factual shortcomings, the basis for the court's decision is clear [and the] record gives substantial and unequivocal support for the ultimate conclusion." *Unt v. Aerospace Corp.,* 765 F.2d 1440, 1444 (9th Cir.1985), *cited with approval in Applewood Landscape,* 884 F.2d at 1504. We have also noted that anemic factual findings are not fatal to the decision so long as a complete understanding of the issues may be had from the record on appeal. *Applewood Landscape,* 884 F.2d at 1504 (citations omitted).

▬ After reviewing both the record and the opinion with these principles in mind, we conclude that the district court's findings of fact are adequate. *The Monitor*'s position throughout the trial, put forth by its expert witnesses and its editor-in-chief, was that the technological advances in the field of journalism had rendered the Secretary's interpretations obsolete and that most, if not all, employees in the field today were exempt pro-

fessionals. *The Monitor* tried to highlight the changes in the newspaper business brought about in the last forty years and explain how these changes had undermined the pertinence of the Secretary's interpretations. The district court's opinion makes it clear that it simply did not find this evidence sufficient to render the interpretations inapplicable. *Newspapers of New England, Inc.,* 834 F.Supp. at 535–36.

Once the district court accepted the Secretary's interpretations as persuasive authority, the rest of its decision was all but determined. *The Monitor* presented little or no evidence suggesting that the employees at issue fell into that minority of reporters whose work was dependent on invention, imagination, or talent. *The Monitor* made no significant attempt to differentiate the work of its reporters, photographers, and editors from the work done at every newspaper throughout the country. Given this framework, the district court's admittedly meager findings of fact provide an adequate basis for appellate review. Between the opinion and the record, we have garnered a thorough understanding of the proceedings below, and that is all that Rule 52(a) requires.

## II. The Willfulness of the FLSA Violations.

The FLSA imposes a two-year statute of limitations unless the violations are shown to be willful, in which case a three-year period applies. 29 U.S.C. § 255(a). In the present case, the district court found that the FLSA violations at *The Monitor* were not willful and thus awarded back wages for only the two-year period before the suit was filed rather than the three-year period claimed by the Secretary. The Secretary asserts that *The Monitor*'s FLSA violations were indeed willful and that the district court's determination to the contrary was in error.

▬ FLSA violations are willful where the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d

115 (1988). Whether an FLSA violation is willful is a mixed question of law and fact and is therefore subject to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a). *See McLaughlin v. Hogar San José, Inc.*, 865 F.2d 12, 14 (1st Cir.1989) (holding that whether an FLSA violation was committed in good faith is a mixed question of law and fact and is therefore reviewed only for clear error). Appealing a district court's finding on a mixed question "is an uphill battle as Congress has in unambiguous language expressly granted the primary decisional power in this respect to the district court, not to the Secretary or the courts of appeal." *See id.* (citations omitted). The clearly erroneous standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Rather, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Where the evidence is susceptible of two plausible interpretations, the trier of fact's choice between them cannot be clearly erroneous. *Anderson v. Bessemer City*, 470 U.S. at 574, 105 S.Ct. at 1511–12 (citations omitted).

■ Based upon our review of the record, we find no clear error in the district court's finding that *The Monitor* did not willfully violate the overtime provisions of the FLSA.[17] The Secretary did present plausible arguments in support of his position. The Secretary argued that the violations were willful and could not have been the product of ignorance because the DOL explained the overtime and recordkeeping provisions of the FLSA during its 1974 investigation of the newspaper. Further, the fact that *The Monitor* paid its employees for all reported overtime demonstrates that it was indeed aware of the FLSA overtime requirements. Additionally, several employees testified that they had been instructed by superiors to report no more than forty hours on their weekly timecards. Those employees also testified that they were occasionally reprimanded when they did report overtime and were told to alter their weekly timecards so that no overtime hours would be included.

In its defense, *The Monitor* argued that its policy of discouraging overtime hours while paying those employees who did in fact report them does not compel the conclusion that it was willfully violating the FLSA. Rather, they contended that this policy "illustrates the efforts of an employer trying to do the right thing in the face of hopelessly outdated 40–year–old DOL journalism interpretations which provide absolutely no guidance regarding which journalists in a modern newsroom are exempt and which are not." In support of this contention, *The Monitor*'s editor-in-chief testified that he had never instructed anyone at *The Monitor* to alter a timecard, and that *The Monitor* paid its employees for all reported overtime. The reporters also testified that they would often work unreported overtime to satisfy their own desire to produce high quality work and to avoid the perception that they were slow writers.

Our scrutiny of the record convinces us that both parties bulwarked their respective positions with tenable arguments. Consequently, we cannot find the district court's ruling to be clearly erroneous.[18]

---

17. In pertinent part, the district court's opinion states:

> While it is here arguable that the defendants were unreasonable in not more strictly policing the accuracy of the time cards, the preponderance of the evidence does not support a finding that they acted recklessly. This is particularly true in light of the closeness of the findings in the more recent cases concerning exemptions for those who write and edit for the media.

*Reich v. Newspapers of New England, Inc.*, 834 F.Supp. at 538–39.

18. Again, we find support from the Third Circuit's decision in *Reich v. Gateway Press, Inc.*, 13 F.3d at 702–03. Confronted with essentially the same facts as we now face, it refused to overrule the district court's conclusion that the FLSA violations were not willful. *See id.*

## III. Denial of the Injunction

The Secretary also appeals the district court's refusal to prospectively enjoin *The Monitor* from committing future FLSA violations. The FLSA authorizes the district courts to enjoin violations of the overtime and recordkeeping provisions of the Act. 29 U.S.C. § 217. The issue of whether an injunction is an appropriate remedial measure rests in the sound discretion of the district court, and its decision on this matter will only be disturbed on appeal where an abuse of discretion is shown. *Martin v. Coventry Fire Dist.*, 981 F.2d 1358, 1362 (1st Cir.1992) (citation omitted). In exercising its discretion, the district court should weigh the finding of the violation established at trial against the factors that indicate the violations are not likely to recur, "such as intent to comply, extraordinary efforts to prevent recurrence, absence of repetitive violations, and absence of bad faith." *Id.*

Reviewing the record with these factors in mind leads us to the inescapable conclusion that the district court did not abuse its discretion in denying the injunction. The violations at *The Monitor* were not the product of bad faith. Nor were they committed willfully. Rather, the violations can in part be traced to the indeterminate status of the FLSA exemptions in the field of journalism.[19] Further, although *The Monitor* steadfastly insisted throughout the trial and appeal that the majority of its journalists were exempt professionals, it represented to the district court that it fully intended to comply with requirements of the FLSA as clarified by the ultimate judicial resolution of this case. In these circumstances, the denial of the injunction was not an abuse of discretion.

## IV. Denial of Post-investigation Damages

As discussed above, the Secretary sought to introduce evidence and win back wages for FLSA violations that had allegedly occurred after the DOL concluded its investigation at *The Monitor*. The district court allowed the evidence pending a final ruling on admissibility. Ultimately, the court excluded the evidence and refused to award monetary relief for any violations alleged to have occurred after January 25, 1980, approximately the last day of the period covered by the DOL investigation. With regard to this determination, the court stated:

> The reason for this ... limitation is that, although plaintiff claims "continuing" violations of FLSA, the case was largely prepared by the defendants on the ground that violations, if any, did not continue beyond January 25, 1980. The court, having taken the matter under advisement, Tr. 1–43, 44, finds and rules that it would be unjust and inequitable to allow damages to be recovered for a period beyond January 25, 1980.

*Newspapers of New England, Inc.*, 834 F.Supp. at 539 (citing *Donovan v. Burger King Corp.*, 672 F.2d 221, 229 (1st Cir.1982)).

The Secretary argues that *The Monitor* was well aware that the complaint sought back wages for post-investigation violations and that *The Monitor* had ample time before trial to conduct discovery pertinent to this issue. Therefore, the Secretary contends, the district court's limitation of damages was an abuse of discretion. We disagree. The record contains ample support for the district court's determination that *The Monitor* was unfairly surprised by the Secretary's attempt to prove post-investigation violations at trial. Exhibit A attached to the Secretary's complaint accurately detailed the amount of back wages sought for each employee. Exhibit A did not indicate that the claimed wages would be revised at trial to reflect post-investigation violations.[20] The Pre-trial Order's summary of the Secretary's claims also did not reflect post-investigation damages. Rather, the Pre-trial Order stated that damages sought by the Secretary were only those contained in Exhibit A. Furthermore, the DOL compliance officer in charge of the case

---

**19.** The violations at issue were committed in the late 1970's, long before the current case law began to clarify the issue.

**20.** The fact that Exhibit A did not indicate that the Secretary would seek damages for post-investigation violations is not dispositive because the Secretary's complaint did aver that the violations were ongoing.

stated at his deposition that Exhibit A contained all the claims being brought by the Secretary. Counsel for the DOL failed to object to either the Pre-trial Order or the testimony of its compliance officer. The district court apparently found that this confluence of events led *The Monitor* to conduct its discovery on the reasonable belief that the Secretary did not intend to pursue back wages for post-investigation violations.[21] We do not find this to be an abuse of discretion.

*Affirmed.*

---

21. After discovery closed, the Secretary sought to reopen discovery to update its back wage computations so that they would reflect post-investigation violations. Though the magistrate judge hearing the motion ultimately denied it, the Secretary's supporting arguments are enlightening:

> The sole choice, therefore, for ... the Court is whether the pay practices at issue are to be dealt with in one lawsuit or in a series of lawsuits. It is Plaintiff's position that resolution of all back wage claims in a single litigation would involve less expenditure of time and money.... Plaintiff is, however, fully prepared to file a second lawsuit to protect its right to assert its claims as to unpaid back wages for the period January 26, 1980 to the present.

Obviously, this motion notified *The Monitor* that the Secretary sought post-investigation damages. It is equally clear, however, that the Secretary believed at the time that it would be forced to file a second lawsuit to secure post-investigation damages if the motion to reopen discovery was denied. The Secretary cannot now prevail in arguing that the district court abused its discretion by finding that *The Monitor* was understandably unprepared at trial to defend allegations of post-investigation violations. The Secretary should have either filed a second lawsuit or objected to the magistrate judge's denial of the motion pursuant to Fed.R.Civ.P. 72(a). The fact that it did neither may not be rectified through this appeal.